Opinion for the Court filed by Senior Circuit Judge SILBERMAN.
Dissenting opinion filed by Circuit Judge GARLAND.
SILBERMAN, Senior Circuit Judge:
Plaintiff Iraqi nationals brought separate suits against two private military contractors that provided services to the U.S. government at the Abu Ghraib military prison during the war in Iraq. The district court granted summary judgment in behalf of one of the contractors, Titan Corp., on grounds that the plaintiffs’ state tort claims were federally preempted. But the court denied summary judgment on those grounds to the other contractor, CACI International Inc. The court also dismissed claims both sets of plaintiffs made under the Alien Tort Statute (which is appealed only by the Titan plaintiffs) and reserved for further proceedings in the CACI case that contractor’s immunity defense. We have jurisdiction over this interlocutory appeal under 28 USC §§ 1291 and 1292(b). We affirm the district court’s judgment in behalf of Titan, but reverse as to CACI.
I
Defendants CACI and Titan contracted to provide in Iraq interrogation and interpretation services, respectively, to the U.S. military, which lacked sufficient numbers of trained personnel to undertake these critical wartime tasks. The contractors’ employees were combined with military personnel for the purpose of performing the interrogations, and the military retained control over the tactical and strategic parameters of the mission. Two separate groups of plaintiffs, represented by the named plaintiffs Haidar Muhsin Saleh and Ilham Nassir Ibrahim, brought suit alleging that they or their relatives had been abused by employees of the two contractors during their detention and interrogation by the U.S. military at the Abu Ghraib prison complex. While the allegations in the two cases are similar, the Saleh plaintiffs also allege a broad conspiracy between and among CACI, Titan, various civilian officials (including the Secretary and two Undersecretaries of Defense), and a number of military personnel, whereas the Ibrahim plaintiffs allege only that CACI and Titan conspired in the abuse.
As we were told, a number of American servicemen have already been subjected to criminal court-martial proceedings in relation to the events at Abu Ghraib and have been convicted for their respective roles. While the federal government has jurisdiction to pursue criminal charges against the contractors should it deem such action appropriate, see 18 U.S.C. § § 2340A, 2441, 3261, and although extensive investigations were pursued by the Department of Justice upon referral from the military investigator, no criminal charges eventuated against the contract employees. (Iraqi contract employees are also subject to criminal suit in Iraqi court.) Nor did the government pursue any contractual remedies against either contractor. The U.S. Army Claims Service has confirmed that it will compensate detainees who establish legitimate claims for relief under the Foreign Claims Act, 10 U.S.C. § 2734. Saleh *3 pursued such a route, succeeding in obtaining $5,000 in compensation, despite the fact that the Army’s investigation indicated that Saleh was never actually interrogated or abused.
While the terms “torture” and “war crimes” are mentioned throughout plaintiffs’ appellate briefs and were used sporadically at oral argument, the factual allegations in the plaintiffs’ briefs are in virtually all instances limited to claims of “abuse” or “harm.” To be sure, as the dissent emphasizes, certain allegations in the complaints are a good deal more dramatic. But after discovery and the summary judgment proceeding, for whatever reason, plaintiffs did not refer to those allegations in their briefs on appeal. Indeed, no accusation of “torture” or specific “war crimes” is made against Titan interpreters in the briefs before us. We are entitled, therefore to take the plaintiffs’ cases as they present them to us. And although, for purpose of this appeal, we must credit plaintiffs’ allegations of detainee abuse, defendants point out — and it is undisputed — that government investigations into the activities of the apparently relevant Titan employees John Israel and Adel Nakhla suggest that these individuals were not involved in detainee abuse at all. Other linguists mentioned in plaintiffs’ briefs' — “Iraqi Mike,” Etaf Mheisen, and Hamza Elsherbiny- — are not alleged to have engaged in abuse involving the plaintiffs. Steven Stefanowicz, alleged in one set of complaints to have been an employee of Titan, was in fact an employee of CACI. And only one specified instance of activity that would arguably fit the definition of torture (or possibly war crimes) is alleged with respect to the actions of a CACI employee. Titan J.A. 567-570.[1]
Plaintiffs brought a panoply of claims, including under the Alien Tort Statute (“ATS”), 28 U.S.C. § 1350, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq., government contracting laws, various international laws and agreements, and common law tort. In a thoughtful opinion, District Judge Robertson dismissed all of the Ibrahim plaintiffs’ claims except those for assault and battery, wrongful death and survival, intentional infliction of emotional distress, and negligence. Ibrahim v. Titan Corp., 391 F.Supp.2d 10 (D.D.C.2005). Following our decisions in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir.1984) (Edwards, J., concurring), and Sanchez-Espinoza v. Reagan, 770 F.2d 202 (D.C.Cir. 1985), the district court held that because there is no consensus that private acts of torture violate the law of nations, such acts are not actionable under the ATS’s grant of jurisdiction. Ibrahim, 391 F.Supp.2d at 14-15.[2]
*4 As for the remaining claims, the district court found that there was, as yet, insufficient factual support to sustain the application of the preemption defense, which the defendants had asserted. The judge ordered limited discovery regarding the military’s supervision of the contract employees as well as the degree to which such employees were integrated into the military chain of command. Id. at 19. A year later, the district court dismissed the federal claims of the Saleh plaintiffs. Saleh v. Titan Corp., 436 F.Supp.2d 55 (D.D.C. 2006) . The two sets of cases were consolidated for discovery purposes.
Following discovery, the contractors filed for summary judgment, again asserting that all remaining claims against them should be preempted as claims against civilian contractors providing services to the military in a combat context. In the absence of controlling authority, the district judge fashioned a test of first impression, according to which this preemption defense attaches only where contract employees are “under the direct command and exclusive operational control of the military chain of command.” Ibrahim v. Titan Corp., 556 F.Supp.2d 1, 5 (D.D.C. 2007) (emphasis added). He concluded that Titan’s employees were “fully integrated into [their] military units,” id. at 10, essentially functioning “as soldiers in all but name,” id. at 3. Although CACI employees were also integrated with military personnel and were within the chain of command, they were nevertheless found to be subject to a “dual chain of command” because the company retained the power to give “advice and feedback” to its employees and because interrogators were instructed to report abuses up both the company and military chains of command. Id. The CACI site manager, moreover, said that he had authority to prohibit interrogations inconsistent with the company ethics policy, which the district court deemed to be evidence of “dual oversight.” Id. Thus, the remaining tort claims were held preempted as to Titan but not as to CACI. Id.
The losing party in each case appealed, and we heard their arguments jointly. We thus have before us two sets of appeals. The first consists of the Iraqi plaintiffs’ appeals from the district court’s decision in favor of Titan on both the preemption and ATS issues. The second features CACI’s appeals from the district court’s denial of its motion for summary judgment on the basis of preemption. We have jurisdiction pursuant to 28 U.S.C. § 1291 over the former. As to the latter, the district court has certified its denial of summary judgment for immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The plaintiffs only half-heartedly object to the district judge’s exercise of discretion under § 1292(b). Even if we were inclined to withdraw this permission to appeal — which we are not — we would still be required to rule on the appropriate test for combatant activities preemption in the plaintiffs’ appeals against the judgment for Titan. We also have jurisdiction over the district judge’s dismissal of the ATS claim in the Titan case, but not his corollary dismissal of the ATS claim in the CACI case; the plaintiffs did not cross-appeal that decision.
We think the district judge properly focused on the chain of command and the degree of integration that, in fact, existed between the military and both contractors’ employees rather than the contract terms — and affirm his findings in that regard. We disagree, however, somewhat with the district court’s legal test: “exclusive” operational control. That CACI’s employees were expected to report to their civilian supervisors, as well as the military chain of command, any abuses they observed and that the company retained the power to give advice and feedback to its *5 employees, does not, in our view, detract meaningfully from the military’s operational control, nor the degree of integration with which CACI’s employees were melded into a military mission. We also agree with the district court’s disposition of the ATS claim against Titan.
II
We conclude that plaintiffs’ D.C. tort law claims are preempted for either of two alternative reasons: (a) the Supreme Court’s decision in Boyle; and (b) the Court’s other preemption precedents in the national security and foreign policy field.
Although both defendants assert that they meet the district court’s “direct command and exclusive operational control” test for application of the preemption defense, CACI disputes the appropriateness of that test, arguing that it does not adequately protect the federal interest implicated by combatant activities. In CACI’s view, the wartime interests of the federal government are as frustrated when a contractor within the chain of command exercises some level of operational control over combatant activities as would be true if all possible operational influence is exclusively in the hands of the military. For their part, the Iraqi plaintiffs agree with the district court’s finding that CACI exerted sufficient operational control over its employees as to have been able to prevent the alleged prisoner abuse and thus that the company should be subject to suit. As to Titan, plaintiffs argue that the district court overlooked critical material facts, including allegations that Titan breached its contract and that the military lacked the authority to discipline Titan employees.
As noted, both defendants asserted a defense based on sovereign immunity, which the district court has reserved. Presumably, they would argue that, notwithstanding the exclusion of “contractors with the United States” from the definition of “Federal agency” in the Federal Tort Claims Act (“FTCA”) — which, of course, waives sovereign immunity — when a contractor’s individual employees under a service contract are integrated into a military operational mission, the contractor should be regarded as an extension of the military for immunity purposes. The Supreme Court in Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the primary case on which defendants rely for their preemption claim, reserved the question whether sovereign immunity could be extended to nongovernmental employees, id. at 505 n. 1, 108 S.Ct. 2510, even in a case where the contractor provided a discrete product to the military.
We agree with the defendants (and the district judge) that plaintiffs’ common law tort claims are controlled by Boyle. There, a lawsuit under Virginia tort law was brought in federal district court in behalf of a Marine pilot who was killed when his helicopter crashed into the water and he was unable to open the escape hatch (which opened out rather than in). The defendant that manufactured the helicopter alleged that the door was provided in accordance with Department of Defense specifications and, therefore, Virginia tort law was preempted. The Supreme Court agreed; it reasoned that first “uniquely federal interests” were implicated in the procurement of military equipment by the United States, and once that was recognized, a conflict with state law need not be as acute as would be true if the federal government was legislating in an area traditionally occupied by the states.
Nevertheless, the court acknowledged that a significant conflict must exist for state law to be preempted. In Boyle, the court observed that the contractor could *6 not satisfy both the government’s procurement design and the state’s prescribed duty of care. It looked to the FTCA’s exemption to the waiver of sovereign immunity for claims “based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused,” 28 U.S.C. § 2680(a), to find a statutory provision that articulated the “outlines” of the significant conflict between federal interests and state law. Boyle, 487 U.S. at 511, 108 S.Ct. 2510. Since the selection of the appropriate design of military equipment was obviously a governmental discretionary function and a lawsuit against a contractor that conformed to that design would impose, the same costs on the government indirectly that the governmental immunity would avoid, the conflict is created.
The crucial point is that the court looked to the FTCA exceptions to the waiver of sovereign immunity to determine that the conflict was significant and to measure the boundaries of the conflict. Our dissenting colleague contends repeatedly that the FTCA is irrelevant because it specifically excludes government contractors. See Dissent Op. at 20, 23-24, 26. But, in that regard, our colleague is not just dissenting from our opinion, he is quarreling with Boyle where it was similarly argued that the FTCA could not be a basis for preemption of a suit against contractors. See Supplemental Brief of Petitioner at 10-11, 1988 WL 1026235; see also 487 U.S. at 526-27, 108 S.Ct. 2510 (Brennan, J., dissenting). In our case, the relevant exception to the FTCA’s waiver of sovereign immunity is the provision excepting “any claim arising out of the combatant activities of the military or armed forces, or the Coast Guard, during time of war.” 28 U.S.C. § 2680(j).[3] We note that this exception is even broader than the discretionary function exception. In the latter situation, to find a conflict, one must discover a discrete discretionary governmental decision, which precludes suits based on that decision, but the former is more like a field preemption, see, e.g., Clearfield Trust Co. v. United States, 318 U.S. 363, 366-67, 63 S.Ct. 573, 87 L.Ed. 838 (1943), because it casts an immunity net over any claim that arises out of combat activities. The arising-out-of test is a familiar one used in workmen’s compensation statutes to denote any causal connection between the term of employment and the injury.[4]
The parties do not seriously dispute the proposition that uniquely federal interests are implicated in these cases, nor do the plaintiffs contend that the detention of enemy combatants is not included within the phrase “combat activities.” Moreover, although the parties dispute the degree to which the contract employees were integrated into the military’s operational activities, there is no dispute that they were in fact integrated and performing a common *7 mission with the military under ultimate military command. They were subject to military direction, even if not subject to normal military discipline. Instead, the plaintiffs argue that there is not a significant conflict in applying state or Iraqi tort law to the behavior of both contractors’ employees because the U.S. government itself openly condemned the behavior of those responsible for abusing detainees at Abu Ghraib — at least the Army personnel involved.
In order to determine whether a significant conflict exists between the federal interests and D.C. tort law, it is necessary to consider the reasons for the combat activities exception. The legislative history of the combatant activities exception is “singularly barren,” but it is plain enough that Congress sought to exempt combatant activities because such activities “by their very nature should be free from the hindrance of a possible damage suit.” Johnson v. U.S., 170 F.2d 767, 769 (9th Cir.1948). As the Ninth Circuit has explained, the combatant activities exception was designed “to recognize that during wartime encounters[,] no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action.” Koohi v. U.S., 976 F.2d 1328, 1337 (9th Cir.1992) (holding preempted claims against a defense contractor implicated in the Navy’s accidental shoot-down of an Iranian commercial airliner); see also Ibrahim, 391 F.Supp.2d at 18 (“war is an inherently ugly business”).
To be sure, to say that tort duties of reasonable care do not apply on the battlefield is not to say that soldiers are not under any legal restraint. Warmaking is subject to numerous proscriptions under federal law and the laws of war. Yet, it is clear that all of the traditional rationales for tort law — deterrence of risk-taking behavior, compensation of victims, and punishment of tortfeasors — are singularly out of place in combat situations, where risk-taking is the rule. Koohi, 976 F.2d at 1334-35; see also, Bentzlin v. Hughes Aircraft Co., 833 F.Supp. 1486, 1493 (C.D.Cal. 1993). In short, the policy embodied by the combatant activities exception is simply the elimination of tort from the battlefield, both to preempt state or foreign regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in potential subjection to civil suit. And the policies of the combatant activities exception are equally implicated whether the alleged tortfeasor is a soldier or a contractor engaging in combatant activities at the behest of the military and under the military’s control. Indeed, these cases are really indirect challenges to the actions of the U.S. military (direct challenges obviously are precluded by sovereign immunity).
The nature of the conflict in this case is somewhat different from that in Boyle — a sharp example of discrete conflict in which satisfying both state and federal duties (i.e., by designing a helicopter hatch that opens both inward and outward) was impossible. In the context of the combatant activities exception, the relevant question is not so much whether the substance of the federal duty is inconsistent with a hypothetical duty imposed by the state or foreign sovereign. Rather, it is the imposition per se of the state or foreign tort law that conflicts with the FTCA’s policy of eliminating tort concepts from the battlefield. The very purposes of tort law are in conflict with the pursuit of warfare. Thus, the instant case presents us with a more general conflict preemption, to coin a term, “battle-field preemption”: the federal government occupies the field when it comes to warfare, and its interest in combat is always “precisely contrary” to the imposition of a non-federal tort duty. Boyle, 487 U.S. at 500, 108 S.Ct. 2510.
*8 Be that as it may, there are specific conflicts created if tort suits are permitted. Of course, the costs of imposing tort liability on government contractors is passed through to the American taxpayer, as was recognized in Boyle. More important, whether the defendant is the military itself or its contractor, the prospect of military personnel being haled into lengthy and distracting court or deposition proceedings is the same where, as here, contract employees are so inextricably embedded in the military structure. Such proceedings, no doubt, will as often as not devolve into an exercise in finger-pointing between the defendant contractor and the military, requiring extensive judicial probing of the government’s wartime policies. Allowance of such suits will surely hamper military flexibility and cost-effectiveness, as contractors may prove reluctant to expose their employees to litigation-prone combat situations.[5]
Further, given the numerous criminal and contractual enforcement options available to the government in responding to the alleged contractor misconduct — which options the government evidently has foregone — allowance of these claims will potentially interfere with the federal government’s authority to punish and deter misconduct by its own contractors. See, e.g., Buckman Co. v. Plaintiffs’ Legal Comm., 531 U.S. 341, 350-53, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). And as noted above, the Army Claims Service has confirmed that plaintiffs will not be totally bereft of all remedies for injuries sustained at Abu Ghraib, as they will still retain rights under the Foreign Claims Act. Thus, in light of these alternative remedies, it is simply not accurate to say, as the dissent does, that our decision today leaves the field without any law at all, Dissent Op. at 31-32.
Just as in Boyle, however, the “scope of displacement” of the preempted non-federal substantive law must be carefully tailored so as to coincide with the bounds of the federal interest being protected. In that case, the Supreme Court promulgated a three-part test to determine when preemption is required in the design defects context: “Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to these specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.” Boyle, 487 U.S. at 512, 108 S.Ct. 2510. This test served to ensure that a “discretionary function” of the government was truly at stake and to eliminate any perverse incentive for a manufacturer to fail to disclose knowledge of potential risks. Id. at 512-13, 108 S.Ct. 2510. Here, the district court concluded that the federal interest in shielding the military from battlefield damage suits is sufficiently protected if claims against contract employees “under the direct command and exclusive operational control of the military chain of command such that they are functionally serving as soldiers” are preempted. Ibrahim, 556 F.Supp.2d at 5.
We agree with CACI that this “exclusive operational control” test does not protect the full measure of the federal interest embodied in the combatant activities exception. Surely, unique and significant federal interests are implicated in situations where operational control falls short of exclusive. As CACI argues, that a contractor has exerted some limited influence over an operation does not undermine the *9 federal interest in immunizing the operation from suit. Indeed, a parallel argument drawn from the Eleventh Circuit for a rule that would preclude suit “only if ... the contractor did not participate, or participated only minimally, in the design of the defective equipment” was rejected by the Supreme Court in Boyle as “not a rule designed to protect the federal interest embodied in the ‘discretionary function’ exemption.” Whether or not the contractors participated in the design of the helicopter door, the government official made the policy judgment, and it is that judgment that is protected by preemption. 487 U.S. at 513,108 S.Ct. 2510.
The district court’s test as applied to CACI and Titan, moreover, creates a powerful (and perverse) economic incentive for contractors, who would obviously be deterred from reporting abuse to military authorities if such reporting alone is taken to be evidence of retained operational control. That would be quite anomalous since even uniformed military personnel are obliged to refuse manifestly unlawful orders, see United States v. Calley, 22 U.S.C.M.A. 534, 544, 1973 WL 14894 (1973), and, moreover, are encouraged to report such outside of the chain of command to inspector generals, see, e.g., 10 U.S.C. § 1034. Again we see an analogy to Boyle. As noted, the Eleventh Circuit would have allowed the contractor a preemption defense only if the contractors did not participate at all in the design of the helicopter door. The Supreme Court pointed out that that test would create an analogous perverse incentive, discouraging contractors from participating in design features where their expertise would help to better the product. Boyle, 487 U.S. at 512-13, 108 S.Ct. 2510.
We think that the following formulation better secures the federal interests concerned: During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor’s engagement in such activities shall be preempted. We recognize that a service contractor might be supplying services in such a discrete manner — perhaps even in a battlefield context — that those services could be judged separate and apart from combat activities of the U.S. military.[6] That would be analogous to the court’s recognition in Boyle that a supply contractor that had a contract to provide a product without relevant specifications would not be entitled to the preemption defense if its sole discretion, rather than the government’s, were challenged (although we are still puzzled at what interest D.C., or any state, would have in extending its tort law onto a foreign battlefield).
We believe, compare Dissent Op. at 27, our decision is consistent with statements made by the Department of Defense in a rulemaking proceeding after the alleged events in this case in which it stated that “[t]he public policy rationale behind Boyle *10 does not apply when a performance-based statement of work is used in a services contract, because the Government does not, in fact, exercise specific control over the actions and decisions of the contractor” Contractor Personnel Authorized to Accompany U.S. Armed Forces, 73 Fed. Reg. 16,764, 16,768 (Mar. 31, 2008) (emphasis supplied). Because performance-based statements of work “describe the work in terms of the required results rather than either ‘how’ the work is to be accomplished or the number of hours to be provided,” 48 C.F.R. § 37.602(b)(1),. by definition, the military could not retain command authority nor operational control over contractors working on that basis and thus tort suits against such contractors would not be preempted under our holding. Indeed, there is no indication from the department’s statements that it considered, much less ruled out, whether tort suits against service contractors working within the military chain of command should be preempted on the basis of the FTCA’s “combatant activities” exception.
It is argued that because the executive branch has not chosen to intervene in this suit or file an amicus brief on behalf of defendants, this case differs from Boyle. But the government did not participate in Boyle below the Supreme Court, which has also been the case in some other proceedings. See e.g., Nat’l Foreign Trade Council v. Natsios, 181 F.3d 38, 54 n. 9 (1st Cir.1999), aff'd sub nom. Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352; Davidowitz v. Hines, 30 F.Supp. 470 (D.Pa.1939), aff'd 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581; see also Zschernig v. Miller, 389 U.S. 429, 443, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968) (finding Oregon statute preempted even though Solicitor General argued as amicus that application of the statute did not “unduly interfere!] with the United States’ conduct of foreign relations” because “the basic allocation of power between the States and the Nation ... cannot vary from day to day with the shifting winds at the State Department”) (Stewart, J. concurring). To be sure, the executive branch has broadly condemned the shameful behavior at Abu Ghraib documented in the now infamous photographs of detainee abuse. This disavowal does not, however, bear upon the issue presented in this tort suit against these defendants. Indeed, the government acted swiftly to institute court-martial proceedings against offending military personnel, but no analogous disciplinary, criminal, or contract proceedings have been so instituted against the defendants. This fact alone indicates the government’s perception of the contract employees’ role in the Abu Ghraib scandal. In any event, Congress at least has indicated that common law tort suits “arising out of’ combatant activities conflict with the very real interests of the military in time of war.
Our holding is also consistent with the Supreme Court’s recent decision in Wyeth v. Levine, 555 U.S. -, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009). In that case, the Court held that federal law did not preempt a patient’s state law inadequate warning claim against a drug manufacturer, because compliance with both the state and federal duties was not impossible and because the manufacturer’s interpretation of congressional intent was overly broad. The Court cited two “cornerstones” of preemption jurisprudence, both of which helpfully illuminate the distinctions between the instant case and Wyeth. Id., at 1194. The first is congressional intent, which, while murky at . best in the context of federal drug regulations, is much clearer in the case of the statutory text of the combatant activities exception. Id. And the second is the strong presumption against preemption in fields that the states have traditionally occupied but *11 where Congress has legislated nonetheless. Id. Unlike tort regulation of dangerous or mislabeled products, the Constitution specifically commits the Nation’s war powers to the federal government, and as a result, the states have traditionally played no role in warfare. We think that these “cornerstones” of preemption secure the foundation of our holding.
The federal government’s interest in preventing military policy from being subjected to fifty-one separate sovereigns (and that is only counting the American sovereigns) is not only broad — it is also obvious. Plaintiffs did not, at the briefing stage, even identify ivhich sovereign’s substantive common law of tort should apply to their case although at oral argument counsel explained that, in its view, D.C. law applied.[7] Defendants’ actions thus were at a minimum potentially subject to the laws of fifty states plus the District of Columbia, perhaps even U.S. overseas dependencies and territories (if detainee counsel’s reliance at oral argument on “all law” is to be credited). And as we have pointed out, on appeal plaintiffs rely on general claims of abuse which include assault and battery, negligence, and the intentional infliction of emotional distress. The application of those tort concepts surely differ in 51 jurisdictions. We can also imagine many other causes of action, which vary by jurisdiction, that under the dissent’s standard could apply to employees of government contractors on the battlefield such as defamation, invasion of privacy, etc. Indeed, in light of the District’s choice of law principles, see Drs. Groover, Christie & Merritt, P.C. v. Burke, 917 A.2d 1110, 1117 (D.C.2007) (applying a “government interests analysis”), it is far from unlikely that the applicable substantive law would be that of Iraq.
The dissent suggests that some jurisdictions’ tort laws — which, are not specified— might be selectively preempted, see Dissent Op. at 30, but apparently not even “intentional infliction of emotional distress.” The dissent’s focus on the notoriety of Abu Ghraib and its failure to specify which torts would be preempted runs the risk of fashioning an encroachment with federal interests that is like “a restricted railroad ticket, good for this day and train only.” Smith v. Allwright, 321 U.S. 649, 669, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (Roberts, J., dissenting).
Arguments for preemption of state prerogatives are particularly compelling in times of war. In that regard, even in the absence of Boyle the plaintiffs’ claims would be preempted. The states (and certainly foreign entities) constitutionally and traditionally have no involvement in federal wartime policy-making. See U.S. Const. Art I, § 10; see also, American Ins. Ass’n v. Garamendi, 539 U.S. 396, 420 n. 11, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) (“If a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility, field preemption might be the appropriate doctrine, whether the National Government had acted and, if it had, without reference to the degree of any conflict, the principle having been established that the Constitution entrusts foreign policy exclusively to the National Government.”); Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 387-88, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (“A failure to provide for preemption expressly may reflect nothing more than the settled character of implied preemption doctrine that *12 courts will dependably apply.”); Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 447-49, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979); Zschernig v. Miller, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968); Hines v. Davidowitz, 312 U.S. 52, 63, 61 S.Ct. 399, 85 L.Ed. 581 (1941) (“Our system of government ... imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference.”). On the other side of the balance, the interests of any U.S. state (including the District of Columbia) are de minimis in this dispute — all alleged abuse occurred in Iraq against Iraqi citizens. The scope of displacement under our “ultimate military authority” test is thus appropriately broader than either Boyle’s discretionary functions test or the rule proposed by the district court. The breadth of displacement must be inversely proportional to state interests, just as it is directly proportional to the strength of the federal interest.
While the dissent suggests that the cases cited above are inapposite because the “preempted state laws conflicted with express congressional or executive policy,” Dissent Op. at 24-25, the assertion is simply not accurate.[8] In Garamendi, for example, the Supreme Court held that a California statute requiring insurance companies doing business in that state to disclose information concerning policies it sold in Europe between 1920 to 1945 was preempted by federal law. 539 U.S. at 401, 123 S.Ct. 2374. As the source of preemption, the Court relied on an executive agreement between the United States and Germany. The agreement provided that Germany would form and provide funding for a foundation which would adjudicate Holocaust-era insurance claims. Id. at 406, 123 S.Ct. 2374. For its part, the United States agreed that, should any plaintiff file a Holocaust-era insurance claim against a German company in U.S. court, the executive would submit a nonbinding statement indicating “that U.S. policy interests favor dismissal on any valid legal ground.” Id. The state and federal law thus posed no express conflict — it would have been entirely possible for insurance companies to disclose information under California’s legislation and still benefit from the national government’s intervention should suit be filed against them in U.S. courts. Nonetheless, the Supreme Court held that the California statute was preempted because the California statute “employs a different state system of economic pressure and in doing so undercuts the President’s diplomatic discretion and choice he has made exercising it.” Id. at 423-24, 123 S.Ct. 2374 (quotation omitted); see also id. at 427, 123 S.Ct. 2374 (“The basic fact is that California seeks to use an iron fist where the President has consistently chosen kid gloves.”). While the dissent attempts to distinguish Garamendi by pointing out that the Supreme Court characterized the state statute at issue *13 there as posing a “clear conflict” with federal policy, the same words could be used here.
Similarly, in Crosby, the Supreme Court held that a Massachusetts statute prohibiting the state from purchasing goods and services from companies doing business in Burma was preempted by a federal statute that inter alia gave the President the power to, upon certain conditions, prohibit United States persons from investing in Burma. 530 U.S. at 367-69, 120 S.Ct. 2288. As in Garamendi, despite the fact that companies could comply with both state and federal laws, the Court explained that the state statute was preempted because it was “at odds with ... the federal decision about the right degree of pressure to employ.” Id. In other words, in both Crosby and Garamendi, preemption arose not because the state law conflicted with the express provisions of federal law, but because, under the circumstances, the very imposition of any state law created a conflict with federal foreign policy interests. Much the same could be said here. Not only are these cases not inapposite, they provide an alternative basis for our holding.[9]
We therefore reverse the district court’s holding as to CACI and affirm its Titan holding on a broader rationale.
Hi
It will be recalled that our jurisdiction to entertain the ATS issue extends only to the plaintiffs’ appeals against Titan and not to CACI’s appeals from the district court’s denial of its summary judgment motion on preemption grounds. The statute is a simple, if mysterious, one. It states, “the district court shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350. The Supreme Court recently has wrestled with its meaning and its scope. Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Appellants argue that the district court erred in dismissing their claims against Titan under this statute based on their reading of Sosa. Titan argues that the district court correctly followed our precedents in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir. 1984) (Edwards, J., concurring), and Sanchez-Espinoza v. Reagan, 770 F.2d 202 (D.C.Cir.1985), which conclude that the ATS provides a cause of action against states but not private persons and which survive the Supreme Court’s analysis in Sosa.
The latter case involved a tort claim brought, inter alia, against a Mexican na *14 tional, Sosa, who purportedly acted on the DEA’s behalf to abduct a Mexican physician accused of torture and murder and bring him from Mexico to stand trial in the United States. Sosa was acquitted of criminal charges and then brought his suit. The Supreme Court, reversing the Ninth Circuit, held that four DEA agents also named as .defendants were immune from suit because of an exception to the FTCA waiver of sovereign; immunity for actions in foreign countries.[10] Then it turned to the claim against Sosa under the ATS. Sosa and the U.S. government argued that the ATS was only a jurisdictional grant; it did not create any substantive law, but the Court disagreed, concluding that when the statute was passed by the first Congress as part of the Judiciary Act of 1789, three limited causes of action were contemplated: piracy, infringement of ambassadorial rights, and violation of safe conduct.[11] And more important for our case, the Court opened the door a crack to the possible recognition of new causes of action under international law (such as, perhaps, torture) if they were firmly grounded on an international consensus. Sosa, 542 U.S. at 732-33, 124 S.Ct. 2739. The court noted, but declined to decide, the issue which divides us from the Second Circuit, whether a private actor, as opposed to a state, could be liable under the ATS. Id. at 733 n. 20, 124 S.Ct. 2739.
The holding in Sosa, however, was to reject the ATS claim that Alvarez was arbitrarily arrested and detained in Mexico in violation of international law because, at the threshold, there was no settled norm of international law bearing on that question that was analogous to the eonsensus that existed in 1789 with respect to the three concerns that motivated Congress.
Appellants argue that despite the footnote reserving the issue dividing the D.C. and Second Circuits, since the Court went on to analyze whether an ATS cause of action existed against Alvarez, it must have implicitly determined that a private actor could be liable. But that is not persuasive: courts often reserve an issue they don’t have to decide because, even assuming arguendo they favor one side, that side loses on another ground.
Plaintiffs rely heavily on the Second Circuit’s opinion in Kadić v. Karãdzíc, 70 F.3d 232, 239 (2d Cir.1995), which held that for certain categories of action, including genocide, the scope of the law of nations is not confined solely to state action but reaches conduct “whether undertaken by those acting under the auspices of a state or only as private individuals.” Despite the apparent breadth of this formulation, it must be remembered that in Kadit, the defendant was the self-proclaimed President of the Serbian Republic of Bosnia-Herzegovina, so the holding is not so broad. While Srpska was not yet internationally recognized as a state — thus technically rendering its militia a private entity — a quasi-state entity such as Radovan Karadzic’s militia is easily distinguishable from a private actor such as Titan.
The Sosa Court, while opening the door a crack to the expansion of international law norms to be applied under the ATS, expressed the imperative of judicial restraint. It was pointed out that federal courts today — -as opposed to colonial times — are and must be reluctant to look to the common law, including international *15 law, in derogation of the acknowledged role of legislatures in making policy. Bearing that caution in mind, and in light of the holding in Sosa, we have little difficulty in affirming the district judge’s dismissal of the ATS claim against Titan. As we have noted, appellants’ claim — as it appeared in their briefs and oral argument before us — is stunningly broad. They claim that any “abuse” inflicted or supported by Titan’s translator employees on plaintiff detainees is condemned by a settled consensus of international law. At oral argument, counsel claimed that included even assault and battery.[12] We think that is an untenable, even absurd, articulation of a supposed consensus of international law. (Indeed, it is doubtful that we can discern a U.S. national standard of treatment of prisoners — short of the Eighth Amendment.) In Price v. Socialist People’s Libyan Arab Jamahiriya, 294 F.3d 82, 93-4 (D.C.Cir.2002), we specifically held that the Libyan police’s very rough and abusive handling of American detainees was not a violation of the Torture Victim Protection Act (“TVPA”), § 3(b)(1), 28 U.S.C. § 1350. Athough appellants there did not make a claim under the ATS, if their treatment did not violate American law, perforce they could not draw upon an international consensus.
Assuming, arguendo, that appellants had adequately alleged torture (or war crimes), there still remains the question whether they would run afoul of Sosa’s comments. Athough torture committed by a state is recognized as a violation of a settled international norm, that cannot be said of private actors. See, e.g., Sanchez-Espinoza, 770 F.2d at 206-7; see also, Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment art. I, para. 1, Dec. 10, 1984, 108 Stat. 382, 1465 U.N.T.S. 85 (limiting definition of torture to acts by “a public official or other person acting in an official capacity”); TVPA, § 2(a), 28 U.S.C. § 1350 (establishing liability exclusively for individuals “under actual or apparent authority, or color of law, of any foreign nation”).[13]
Aternatively, it is asserted that defendants, while private parties, acted under the color of law. Athough we have not held either way on this variation, in Teh-Oren, Judge Edwards’ concurring opinion, while not a court holding, suggests that the ATS extends that far. 726 F.2d at 793. And the Supreme Court in Sosa implied that it might be significant for Sosa to establish that Avarez was acting “on behalf of a government.” 542 U.S. at 735, 124 S.Ct. 2739 (although which government — the U.S. or Mexico — is unclear). Of course, plaintiffs are unwilling to assert that the contractors are state actors. Not only would such an admission make deep inroads against their arguments with respect to the preemption defense, it would virtually concede that the contractors have sovereign immunity. Thus, as the district *16 court recognized, appellants are caught between Seylla and Charybdis: they cannot artfully allege that the contractors acted under color of law for jurisdictional purposes while maintaining that their action was private when the issue is sovereign immunity. Ibrahim, 391 F.Supp.2d at 14 (citing Sanchez-Espinoza, 770 F.2d at 207).
In light of the Supreme Court’s recognition of Congress’ superior legitimacy in creating causes of action, see Sosa, 542 U.S. at 725-28, 124 S.Ct. 2739, we note that it is not as though Congress has been silent on the question of torture or war crimes. Congress has frequently legislated on this subject in such statutes as the TVPA, the Military Commissions Act, 10 U.S.C. § 948a et seq., the federal torture statute, 18 U.S.C. 2340-2340A, the War Crimes Act, 18 U.S.C. § 2441, and the Uniform Code of Military Justice, 10 U.S.C. § 801 et seq., but Congress has never created this cause of action. Perhaps most relevant is the TVPA, in which Congress provided a cause of action whereby U.S. residents could sue foreign states for torture, but did not — and we must assume that was a deliberate decision — include as possible defendants either American government officers or private U.S. persons, whether or not acting in concert with government employees. We note that in his signing statement for the TVPA, President George H.W. Bush stated: “I am signing the bill based on my understanding that the Act does not permit suits for alleged human rights violations in the context of United States military operations abroad.... ” Statement by President of the United States, Statement by President George [.H.W.] Bush upon Signing H.R.2092, 1992 U.S.C.C.A.N. 91 (Mar. 12,1992).
The judicial restraint required by Sosa is particularly appropriate where, as here, a court’s reliance on supposed international law would impinge on the foreign policy prerogatives of our legislative and executive branches. See, e.g., Garamendi, 539 U.S. at 413-15, 123 S.Ct. 2374; Zschernig, 389 U.S. at 440-41, 88 S.Ct. 664. As the Sosa Court explained: “Since many attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy ‘ consequences, they should be undertaken, if at all, with great caution.” Sosa, 542 U.S. at 727-28, 124 S.Ct. 2739.[14]
Finally, appellants’ ATS claim runs athwart of our preemption analysis which is, after all, drawn from congressional stated policy, the FTCA. If we are correct in concluding that state tort law is preempted on the battlefield because it runs counter to federal interests, the application of international law to support a tort action on the battlefield must be equally barred. To be sure, ATS would be drawing on federal common law that, in turn, depends on international law, so the normal state preemption terms do not apply. But federal executive action is sometimes treated as “preempted” by legislation. See, e.g., Chamber of Commerce of U.S. v. Reich, 74 F.3d 1322, 1332-39 (D.C.Cir.1996). Similarly, an elaboration of international law in a tort suit applied to a battlefield is preempted by the same considerations that led us to reject the D.C. tort suit.
*17 IV
For the aforementioned reasons, the judgment of the district court as to Titan is affirmed. The judgment as to CACI is reversed in the accompanying order. Thus, plaintiffs’ remaining claims are dismissed.

So ordered.

. The Torture Victim Protection Act, § 3(b)(1), 28 U.S.C. § 1350, defines "torture” as "any act, directed against an individual in the offender’s custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.” (emphasis added) See Price v. Socialist People’s Libyan Arab Jamahiriya, 294 F.3d 82, 91-94 (D.C.Cir.2002). There is an allegation that one of CACTs employees observed and encouraged the beating of a detainee’s soles with a rubber hose, which could well constitute torture or a war crime.

. The ATS reads, in its entirety, "the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350.

. Although the combatant activities exception was the only FTCA exception briefed, it was suggested at oral argument that other provisions could conceivably conflict with the plaintiffs' claims, potentially including 28 U.S.C. § 2680(k) (exempting from the immunity waiver "any claim arising in a foreign country”). Of course, since that issue has not been properly raised, we do not reach it.

. See, e.g., O’Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 507, 71 S.Ct. 470, 95 L.Ed. 483 (1951); U.S. Industries/Federal Sheet Metal, Inc. v. Director, OWCP, 455 U.S. 608, 615, 102 S.Ct. 1312, 71 L.Ed.2d 495 (1982). In the District of Columbia, scope of employment law is expansive enough "to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer’s behalf.” Council on American Islamic Relations v. Ballenger, 444 F.3d 659, 664 (D.C.Cir.2006) (quoting Johnson v. Weinberg, 434 A.2d 404, 409 (D.C.1981)).

. The dissent asserts that such conflicts can be ameliorated through a deus ex machina of litigation management. Dissent Op. at 29. We think that is an illusion.

. Plaintiffs contend that government contractor preemption should be limited to procurement contracts (as in Boyle or Koohi) and should not extend to service contracts, as here. While some lower courts have limited preemption in this manner, see, e.g., McMahon v. Presidential Airways Inc., 460 F.Supp.2d. 1315, 1331 (M.D.Fla.2006); Fisher v. Halliburton, 390 F.Supp.2d 610, 615 (S.D.Tex.2005), we agree with the Eleventh Circuit, which has held that the question of preemption vel non is not contingent on whether a contract is for goods or services. Hudgens v. Bell Helicopters, 328 F.3d 1329, 1345 (11th Cir.2003) (holding claims that service contractor negligently maintained military helicopters preempted by the discretionary functions exception); see also, Ibrahim, 556 F.Supp.2d at 4 n. 3 (following Hudgens). Rather, “the question is whether subjecting a contractor to liability under state tort law would create a significant conflict with a unique federal interest.’’ Hudgens, 328 F.3d at 1334.

. Our dissenting colleague suggests that plaintiffs are ill-advised to base their tort claims on D.C. law. See Dissent Op. at 30-31 But again, we must take the case plaintiffs bring before us.

. Neither are we persuaded by our dissenting colleague's suggestion that these cases are of little precedential weight because the state laws in the above cited cases were "specifically targeted at issues concerning the foreign relations of the United States.” Dissent Op. at 24. Insofar as this lawsuit pursues contractors integrated within military forces on the battlefield, we believe it similarly interferes with the foreign relations of the United States as well as the President’s war making authority. Moreover, contrary to the dissent, it is a black-letter principle of preemption law that generally applicable state laws may conflict with and frustrate the purposes of a federal scheme just as much as a targeted state law. See Riegel v. Medtronic, Inc., 552 U.S. 312, 128 S.Ct. 999, 1008, 169 L.Ed.2d 892 (2008); Bates v. Dow Agrosciences LLC, 544 U.S. 431, 443, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005); Cipollone v. Liggett Group, Inc., 505 U.S. 504, 521, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (plurality opinion). The Supreme Court's preemption cases thus reject the dissent's attempted distinction.

. Even, had plaintiffs focused and limited their allegations before us to actual torture, we note that Congress has passed comprehensive legislation dealing with the subject of war crimes, torture, and the conduct of U.S. citizens acting in connection with military activities abroad. Through acts such as the Torture Victim Protection Act, 28 U.S.C. § 1350, the Military Commissions Act, 10 U.S.C. § 948a et seq, the federal criminal torture statute, 18 U.S.C. § 2340-2340A, the War Crimes Act, 18 U.S.C. § 2441, the Foreign Claims Act, 10 U.S.C. § 2734, and the Uniform Code of Military Justice, ' 10' U.S.C. § 801 et seq, Congress has created an extensive body of law with respect to allegations of torture. But Congress has declined to create a civil tort cause of action that plaintiffs could employ. In the TVPA, for example, Congress provided a cause of action whereby U.S. residents could sue foreign actors for torture, but Congress exempted American government officers and private U.S. persons from the statute. Congress has also adopted criminal statutes that would apply to these defendants had they committed acts of torture, see 18 U.S.C. §§ 2340A, 2241, 3261, but Congress has not created a corresponding tort cause of action. Moreover, even in the years since Abu Ghraib, Congress has not enacted a civil cause of action allowing suit for torture, it only has extended the UCMJ to cover military contractors. 10 U.S.C. § 802.

. Apparently, Sosa never argued for federal preemption of the claims against him on grounds analogous to the instant case.

. There is some indication that the thoroughly modern act of aircraft hijacking may also be on this short list of universal concerns. See, e.g., Kadić v. Karãdzíc, 70 F.3d 232, 240 (2d Cir.1995).

. "Court: So, your allegations are broader than torture.
Counsel: Yes. Your Honor, the allegations turn on the physical force whether or not those are labeled definitionally as torture or not doesn't really matter because we're talking about assault and batteries. And so, you know, if for example, you know, something like—
Court: So, assault and battery would be covered by the law of nations, as well.... Is that correct? Counsel: ... Yes. In this context it would be....”

. Even if torture suits cannot be brought against private parties — at least not yet — it may be that "war crimes” have a broader reach. Of course, we reiterate that appellants have not brought to our attention any specific allegations of such behavior. Presumably for this reason, when the district court considered appellants' ATS argument, it analyzed only an asserted international law norm against torture, not war crimes.

. We note that the Justice Department, in its brief before the Ninth Circuit in the Sosa matter, took the position that "the [ATS] is not intended as a vehicle for U.S. courts to judge the lawfulness of U.S. government actions abroad in defense of national security!,] and any remedies for such actions are appropriately matters for resolution by the political branches, not the courts.” Brief for the United States as Amicus Curiae in Support of Reversal of the Judgment against Defendant-Appellant Jose Francisco Sosa, Alvarez-Machain v. Sosa, No. 99-56880 (9th Cir. Mar. 20, 2000).