EDWARDS, Senior Circuit Judge,
dissenting:
The plaintiff-appellants in this case allege that they were subjected to acts of torture and abuse while being detained at U.S. military facilities in Afghanistan and Iraq. Each appellant was eventually released without being charged with a crime. Appellants filed suit, alleging civil claims under Bivens v. Six Unknown Named *779 Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and the Men Tort Statute (“section 1350” or “ATS”), 28 U.S.C. § 1350, as well as claims for declaratory relief. Following a motions hearing, the District Court granted the appellees’ separate motions to dismiss. See In re Iraq and Afghanistan Detainees Litig. (‘Detainees Litig.”), 479 F.Supp.2d 85 (D.D.C.2007). Mthough I do not disagree with the court’s judgment dismissing appellants’ Bivens claims and their claims for declaratory relief, I dissent from the court’s disposition of appellants’ claims under section 1350.
Section 1350 says that “[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations.” In my view, the Supreme Court’s decision in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), confirms that appellants may pursue a cause of action under section 1350 for deliberate torture perpetrated under color of official authority, and the Westfall Act does not bar these claims. It is ironic that, under the majority’s approach, United States officials who torture a foreign national in a foreign country are not subject to suit in an action brought under section 1350, whereas foreign officials who commit official torture in a foreign country may be sued under section 1350.
The Government’s interpretation of Sosa, which is endorsed by the majority, is strikingly incomplete. The Government first cites a passage from Sosa in which the Court says that the ATS “is a jurisdictional statute creating no new causes of action.” Appellees’ Br. at 47 (quoting Sosa, 542 U.S. at 724, 124 S.Ct. 2739). From this, the Government concludes that, “[ujnder Sosa, it is indisputable the ATS is not a federal statute that is capable of being violated.” Id. at 48.
The Court’s decision in Sosa is much more nuanced than the Government would have it. Md Sosa surely does not foreclose actions under the ATS seeking redress for official torture. Rather, contrary to the Government’s claims, Sosa makes the following critical points:
M Members of the Court agree that § 1350 is only jurisdictional. We also agree, or at least Justice Scalia [in his concurrence] does not dispute, that the jurisdiction was originally understood to be available to enforce a small number of international norms that a federal court could properly recognize as within the common law enforceable without further statutory authority.
Whereas Justice Scalia sees ... developments as sufficient to close the door to further independent judicial recognition of actionable international norms, other considerations persuade us that the judicial power should be exercised on the understanding that the door is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today. Erie [Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938),] did not in terms bar any judicial recognition of new substantive rules, no matter what the circumstances, and post-Erie understanding has identified limited enclaves in which federal courts may derive some substantive law in a common law way.
We think it would be unreasonable to assume that the First Congress would have expected federal courts to lose all capacity to recognize enforceable international norms simply because the common law might lose some metaphysical cachet on the road to modern realism. Later Congresses seem to have shared *780 our view. The position we take today has been assumed by some federal courts for 24 years, ever since the Second Circuit decided Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980), and for practical purposes the point of today’s disagreement has been focused since the exchange between Judge Edwards and Judge Bork in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir.1984). Congress, however, has not only expressed no disagreement with our view of the proper exercise of the judicial power, but has responded to its most notable instance by enacting legislation supplementing the judicial determination in some detail.
542 U.S. at 729-31, 124 S.Ct. 2739 (citation omitted) (emphasis added). As this court recently noted in Saleh v. Titan Corp., 580 F.3d 1 (D.C.Cir.2009), it is clear that Sosa “opened the door a crack to the possible recognition of new causes of action under international law (such as, perhaps, torture) if they were firmly grounded on an international consensus.” Id. at 14.
It is particularly noteworthy that the Supreme Court’s opinion in Sosa says: “The position we take today has been assumed by some federal courts for 24 years, ever since the Second Circuit decided Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980).” 542 U.S. at 731, 124 S.Ct. 2739. Filartiga held that
delibei-ate torture perpetrated under color of official authority violates universally accepted norms of the international law of human rights, regardless of the nationality of the parties. Thus, whenever an alleged torturer is found and served with process by an alien within our borders, § 1350 provides federal jurisdiction.
630 F.2d at 878. The Filartiga court construed section 1350 “not as granting new lights to aliens, but simply as opening the federal courts for adjudication of the rights already recognized by international law.” Id. at 887; see also Sosa, 542 U.S. at 730, 124 S.Ct. 2739 (stating that “the Court is bound by the law of nations which is a part of the law of the land”) (quoting The Nereide, 13 U.S. (9 Cranch) 388, 423, 3 L.Ed. 769 (1815) (Marshall, C.J.)); Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 780 (D.C.Cir.1984) (Edwards, J., concurring) (“[Sjection 1350 itself provides a right to sue for alleged violations of the law of nations.” (footnote omitted)).
Filartiga is firm in its holding that “there are few, if any, issues in international law today on which opinion seems to be so united as the limitations on a state’s power to torture persons held in its custody.” Id. at 881. This court recently echoed this view in Saleh, noting that “torture committed by a state is recognized as a violation of a settled international norm.” 580 F.3d at 15. The Government does not suggest otherwise. So it is clear beyond debate that official torture violates the law of nations.
The fact that the plaintiffs in this case have alleged that United States officials committed torture does not counsel against a cause of action under the ATS. The statute does not exclude claims against state actors. And there is no evidence that recent congressional statutes addressing torture and detainee treatment, respectively, intended to preempt suits under section 1350. In fact, there is evidence to the contrary.
Only one question remains: Does the Federal Employees Liability Reform and Tort Compensation Act of 1988 (“Westfall Act”), Pub. L. No. 100-694, 102 Stat. 4563, bar appellants’ ATS claims from going forward? After careful consideration of Sosa and the case law construing the Westfall Act, I am convinced that the Westfall Act does not bar appellants’ claims. An action that is cognizable under section 1350 falls *781 within the Westfall Act’s exception for “violation[s] of a statute of the United States under which such actionfs] against an individual [are] otherwise authorized,” 28 U.S.C. § 2679(b)(2)(B). The Government argues that section 1350 cannot fall within this exception because the ATS is merely a jurisdictional statute. Appellees’ Br. at 47. In my view, Sosa requires the opposite conclusion: Appellants’ claims arising under section 1350 must fall within the statutory exception to the Westfall Act, because the ATS is a federal statute that incorporates substantive international norms and thereby directly authorizes recovery for deliberate torture perpetrated under color of official authority.
The Government ignores the fact that section 1350, unlike the congressional grant of federal question jurisdiction, “was enacted on the congressional understanding that courts would exercise jurisdiction by entertaining some common law claims derived from the law of nations.” Sosa, 542 U.S. at 731 n. 19, 124 S.Ct. 2739. “Unlike section 1331, which requires that an action ‘arise under’ the laws of the United States, section 1350 does not require that the action ‘arise under’ the law of nations, but only mandates a ‘violation of the law of nations’ in order to create a cause of action.” Tel-Oren, 726 F.2d at 779 (Edwards, J., concurring). Section 1350 incorporates the law of nations — including the prohibition against deliberate torture perpetrated under color of official authority — that can be “violated” within the meaning of the section 2679(b)(2)(B) exception to the Westfall Act. I therefore conclude that, on the record before us, the District Court has jurisdiction over appellants’ complaint alleging official torture and the appellants have a viable cause of action. Consequently, the District Court erred when it dismissed appellants’ claims arising under section 1350.
I. Background
A. The United States Has Consistently and Repeatedly Condemned the Use of Torture
“Torture has long been illegal” in our nation. 151 Cong. Rec. 30,756 (2005) (statement of Sen. Graham). Domestically, torture, along with other punishments of “unnecessary cruelty,” has been proscribed as a violation of the Eighth Amendment since the nineteenth century. Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citing Wilkerson v. Utah, 99 U.S. 130, 136, 25 L.Ed. 345 (1879)). Congress has also prohibited torture that occurs abroad, making such conduct a federal crime punishable by fines and up to 20 years of imprisonment, and even life imprisonment or death should the torture result in a fatality. 18 U.S.C. § 2340A. Congress further created a cause of action against any individual who commits torture “under actual or apparent authority, or color of law, of any foreign nation,” regardless of the victim’s nationality or the geographic location of the alleged acts. Torture Victim Protection Act (“TVPA”), Pub. L. No. 102-256, § 2(a), 106 Stat. 73, 73 (1992) (codified in 28 U.S.C. § 1350 (note)).
Within the context of a military conflict, Congress has declared, in both the Detainee Treatment Act of 2005 (“DTA”) and the Military Commissions Act of 2006 (“2006 MCA”), that “[n]o individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment,” DTA, Pub. L. No. 109-148, div. A, title X, § 1003(a), 119 Stat. 2680, 2739 (codified at 42 U.S.C. § 2000dd(a)); 2006 MCA, Pub. L. No. 109-366, § 6(c)(1), 120 Stat. 2600, 2635 (codified at 42 U.S.C. § 2000dd-0(l)), and has further prohibited any “treatment or technique of interroga *782 tion not authorized by and listed in the United States Army Field Manual on Intelligence Interrogation.” DTA, Pub. L. No. 109-148, div. A, title X, § 1002(a), 119 Stat. at 2739 (codified at 10 U.S.C. § 801 (note)). See also 18 U.S.C. § 2441 (making war crimes committed by or against a member of the U.S. Armed Forces or a U.S. national punishable by fíne, imprisonment, and/or death, regardless of where the crime occurred).
The Executive Branch has been similarly resolute in its prohibition of torture. The United States signed the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (“Convention Against Torture”) in 1988. In 2000, the U.S. Department of State, with input from the Department of Justice and other federal departments and agencies, submitted its initial compliance report to the United Nations Committee Against Torture, which stated:
Torture is prohibited by law throughout the United States. It is categorically denounced as a matter of policy and as a tool of state authority. Every act constituting torture under the [United Nations] Convention [Against Torture] constitutes a criminal offence under the law of the United States. No official of the Government, federal, state or local, civilian or military, is authorized to commit or to instruct anyone else to commit torture. Nor may any official condone or tolerate torture in any form. No exceptional circumstances may be invoked as a justification of torture. United States law contains no provision permitting otherwise prohibited acts of torture or other cruel, inhuman or degrading treatment or punishment to be employed on grounds of exigent circumstances (for example, during a “state of public emergency”) or on orders from a superior officer or public authority, and the protective mechanisms of an independent judiciary are not subject to suspension. The United States is committed to the full and effective implementation of its obligations under the Convention throughout its territory.
Initial Report of the United States of America to the United Nations Committee Against Torture ¶ 6, U.N. Doc. CAT/C/28/ Add.5 (Feb. 9, 2000).
Specifically with regard to military detainees, President George W. Bush, in a statement issued in 2004, affirmed that
America stands against and will not tolerate torture.... American personnel are required to comply with all U.S. laws, including the United States Constitution, Federal statutes, including statutes prohibiting torture, and our treaty obligations with respect to the treatment of all detainees.... Torture is wrong no matter where it occurs, and the United States will continue to lead the fight to eliminate it everywhere.
Statement on United Nations International Day in Support of Victims of Torture, 40 Weekly Comp. Pres. Doc. 1167, 1167-68 (June 26, 2004). In 2009, President Barack Obama, through an executive order, instructed that “[detainees] shall in all circumstances be treated humanely and shall not be subjected to violence to life and person (including murder of all kinds, mutilation, cruel treatment, and torture), nor to outrages upon personal dignity (including humiliating and degrading treatment).” Exec. Order No. 13,491, 3 C.F.R. 199, 200 (2009). See also id. at 200-01 (“Effective immediately, an individual in the custody or under the effective control of an officer, employee, or other agent of the United States Government, or detained within a facility owned, operated, or controlled by a department or agency of the United States, in any armed conflict, shall not be subjected to any interrogation technique or approach, or any treatment related to *783 interrogation, that is not authorized by and listed in Army Field Manual 2-22.3.”).
B. Official Torture Violates the Law of Nations
The United States’ condemnation of official torture is simply a reflection of a firmly established international norm: Torture perpetrated under color of official authority unequivocally violates the law of nations. Every circuit that has addressed the issue has concluded that official torture violates customary international law. See, e.g., Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 120 (2d Cir.2010); id. at 155 (Leval, J., concurring in the judgment); Aldana v. Del Monte Fresh Produce, N. A., Inc., 416 F.3d 1242, 1250-53 (11th Cir. 2005) (per curiam); Kadic v. Karadzic, 70 F.3d 232, 243-44 (2d Cir.1995); Hilao v. Estate of Marcos, 25 F.3d 1467, 1475 (9th Cir.1994); Tel-Oren, 726 F.2d at 788 (Edwards, J., concurring); id. at 819-20 (Bork, J., concurring). Indeed, the Supreme Court in Sosa favorably cited the Second Circuit’s statement in Filartiga that “the torturer has become ... an enemy of all mankind.” 542 U.S. at 732, 124 S.Ct. 2739 (quoting Filartiga, 630 F.2d at 890); see also id. at 762, 124 S.Ct. 2739 (Breyer, J., concurring) (“Today international law will sometimes similarly reflect not only substantive agreement as to certain universally condemned behavior but also procedural agreement that universal jurisdiction exists to prosecute a subset of that behavior. That subset includes torture, genocide, crimes against humanity, and war crimes.” (citation omitted)).
International agreements signed by the United States support the conclusion that torture is a violation of customary international law. Article 2 of the Convention Against Torture provides that “[e]ach State Party shall take effective legislative, administrative, judicial or other measures to prevent such acts of torture in any territory under its jurisdiction.” Art. II, para. 1, signed Apr. 18, 1988, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85; see also S. Exec. Rep. No. 101-30, at 13 (1990) (noting that definition of torture in the Convention Against Torture “correspondió] to the common understanding of torture as an extreme practice which is universally condemned”). In addition, the Geneva Convention of 1949, art. 3 (“Common Article 3”), prohibits torture “at any time and in any place” in an “armed conflict not of an international character.” See Hamdan v. Rumsfeld, 548 U.S. 557, 630, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (explaining that the phrase “conflict not of an international character” was used in contradistinction to Geneva Convention Common Article 2’s application to conflicts between nations, such that Common Article 3 applies to the United States’ conflict with al Qaeda). Ever since the Vietnam War — the first war in which the United States had to consider the Geneva Convention’s application to prisoners in an insurgency environment' — United States military policy has been to apply Common Article 3 to all detainees upon capture. James F. Gebhardt, The Road to Abu Ghraib: US Army Detainee Doctrine and Experience 120 (2005); see also William H. Taft, IV, The Law of Armed Conflict After 9/11: Some Salient Features, 28 Yale J. Int’l L. 319, 321 (2003) (“Terrorists forfeit any claim to POW status under the laws of armed conflict, but they do not forfeit their right to humane treatment — a right that belongs to all humankind, in war and in peace.”).
In sum, there is universal agreement “in the modern usage and practice of nations,” Filartiga, 630 F.2d at 883, that official torture violates the law of nations. Any court addressing torture does not write on a clean slate.
*784 II. Analysis
A. Appellants Have a Cause of Action Under Section 1350 To Seek Redress for Official Torture
The Alien Tort Statute, 28 U.S.C. § 1350, reads as follows: “The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” The statute was passed by Congress as part of the Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73, 77, but it was not much cited before the Second Circuit’s 1980 decision in Filartiga. See 630 F.2d 876 (holding that a cause of action for official torture is cognizable under section 1350). Filartiga led to the well-chronicled debate in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir.1984), between Judge Bork and me about the purpose and scope of section 1350.
In TeL-Oren, I argued that section 1350 provided both federal jurisdiction and “a right to sue for alleged violations of the law of nations,” ie., customary international law. Id. at 780. I went on to emphasize
the extremely narrow scope of section 1350 jurisdiction under the Filartiga formulation. Judge Kaufman characterized the torturer in Filartiga as follows: “Indeed, for purposes of civil liability, the torturer has become — like the pirate and slave trader before him — hostis humani generis, an enemy of all mankind.” Filartiga, 630 F.2d at 890. The reference to piracy and slave-trading is not fortuitous. Historically these offenses held a special place in the law of nations: their perpetrators, dubbed enemies of all mankind, were susceptible to prosecution by any nation capturing them.
Id. at 781.
Judge Bork viewed section 1350 differently. He argued that “it is essential that there be an explicit grant of a cause of action before a private plaintiff be allowed to enforce principles of international law in a federal tribunal.” Id. at 801 (Bork, J., concurring); see also id. (criticizing the Filartiga court’s assumed cause of action under section 1350 as “fundamentally wrong and certain to produce pernicious results”). Judge Bork also tentatively indicated that only offenses akin to the principal offenses against the law of nations cited by Blackstone — violation of safe conducts, infringement of the rights of ambassadors, and piracy — would be actionable under the statute. Id. at 813-16.
Both Judge Bork and I agreed that the function and scope of section 1350 needed clarification from the Supreme Court. Id. at 775 (Edwards, J., concurring) (“This case deals with an area of the law that cries out for clarification by the Supreme Court.”); id. at 823 (Bork, J., concurring) (“Since section 1350 appears to be generating an increasing amount of litigation, it is to be hoped that clarification will not be long delayed.”). The Supreme Court obliged in Sosa.
The issue before the Supreme Court in Sosa was whether respondent Alvarez, a Mexican citizen, could bring a claim against petitioner Sosa, a Mexican citizen hired by the Drug Enforcement Administration, for an alleged violation of the law of nations arising from his arbitrary detention. The Court first noted that “[section 1350] was intended as jurisdictional,” Sosa, 542 U.S. at 714, 124 S.Ct. 2739, and that it “creatfed] no new causes of action,” id. at 724, 124 S.Ct. 2739. However, the Court did not stop there. Rather, it held that
[t]he jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time.... We assume, too, that no devel *785 opment in the two centuries from the enactment of § 1350 to the birth of the modern line of cases beginning with Filartiga v. Pena-Irala has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law; Congress has not in any relevant way amended § 1350 or limited civil common law power by another statute.
Still, there are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind. Accordingly, we think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.
Id. at 724-25, 124 S.Ct. 2739 (citation omitted). The Court thus plainly rejected Judge Bork’s suggestion that only violations of the law of nations extant as of 1789 could be brought pursuant to the ATS. See id. at 729, 124 S.Ct. 2739 (rejecting Justice Scalia’s argument that federal courts should be precluded from “recognizing any further international norms as judicially enforceable today”).
Ultimately, the Court in Sosa rejected the respondent’s complaint on the ground that arbitrary detention did not violate a “norm of customary international law so well defined as to support the creation of a federal remedy.” Id. at 738, 124 S.Ct. 2739. However, the Court surely did not foreclose a cause of action under section 1350 based on allegations of official torture. Quite the contrary. Sosa “opened the door” to causes of action — such as official torture — that are “firmly grounded on an international consensus.” Saleh, 580 F.3d at 14.
B. Torture Committed by U.S. Officials Is Actionable Under the ATS
In this case, appellants allege that they were detained in U.S. military custody in Afghanistan and Iraq and subjected to “torture and other cruel, inhuman or degrading treatment or punishment” as a result of “the orders and derelictions of Defendant [Donald] Rumsfeld and high-level commanders.” Consolidated Am. Compl. for Declaratory Relief and Damages ¶¶ 1, 8 (Jan. 5, 2006), reprinted in Appendix 25, 27. The definition of torture is a matter of some controversy, see, e.g., Judith Resnik, Detention, The War on Terror, and the Federal Courts, 110 Colum. L. Rev. 579, 608-16 (2010), to be decided by the District Court in the first instance. Assuming, however, that the offenses articulated in appellants’ complaint constituted torture — which the Government does not dispute in its brief — I believe that appellants’ claims are actionable under section 1350.
Having established that the ATS grants a cause of action for clear and definite violations of the law of nations, the next question is whether an alien may sue a state actor under section 1350 to seek redress for torture. I can find nothing in the text or history of section 1350 to warrant excluding state actors from its coverage.
The plain text of section 1350 — “[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States” — does not exclude lawsuits against state actors. There continues to be much debate about the origin and original purpose of section 1350. See, e.g., Thomas H. Lee, The Safe-Conduct Theory of the Alien Tort Statute, 106 Colum. L. Rev. 830 (2006); William S. Dodge, The Historical Origins of the Alien Tort Statute: A Re *786 sponse to the “Originalists,” 19 Hastings Int’l & Comp. L. Rev. 221 (1996); William R. Casto, The Federal Courts’ Protective Jurisdiction over Torts Committed in Violation of the Law of Nations, 18 Conn. L. Rev. 467 (1986). However, I can find no compelling evidence in these or any other articles, the words of the statute itself, legislative materials, or the applicable case law to suggest that, in enacting section 1350, Congress made a “legislative judgment,” Sosa, 542 U.S. at 727, 124 S.Ct. 2739, to preclude suits against U.S. officials brought under section 1350. The same holds true for Congress’ more recent enactments of the TVPA, the DTA, and the 2006 MCA. In fact, as noted in Part I, supra, both the Legislative and Executive Branches have long condemned torture perpetrated under color of official authority. Not only has torture been condemned, “[tjorture has long been illegal” in our nation. 151 Cong. Rec. 30,756 (2005) (statement of Sen. Graham).
Although the Supreme Court has held that “special factors” counsel against a remedy for a constitutional violation under Bivens whenever the injury arises out of activity “incident to [military] service,” United States v. Stanley, 483 U.S. 669, 681, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) (internal quotation marks omitted); see also Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (denying Bivens action to military personnel suing superior officers for injuries sustained in course of military service), this reasoning does not translate to actions brought pursuant to section 1350. This is so because, when section 1350 was enacted, Congress expressly gave the federal courts jurisdiction over “[torts] committed in violation of the law of nations.” 28 U.S.C. § 1350. See Sosa, 542 U.S. at 724, 124 S.Ct. 2739 (noting that section 1350 “is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time”). By contrast, constitutional claims under Bivens are not brought pursuant to any statute; the Supreme Court in Bivens “fashioned] a new, judicially crafted cause of action,” Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001), without relying on a congressional imprimatur akin to section 1350.
This court’s recent holding in Saleh that a private government contractor could not be liable for torture under section 1350 also does not control the disposition of this case. Unlike the appellants in the current case, who seek relief against state actors both in their individual and official capacities, the plaintiffs in Saleh were “unwilling to assert that the contractors [were] state actors.” 580 F.3d at 15. Saleh’s holding — that, “[although torture committed by a state is recognized as a violation of a settled international norm, that cannot be said of private actors,” id. — therefore has no bearing on the availability of a cause of action under section 1350 based on allegations of deliberate torture perpetrated under color of official authority.
The Saleh decision also points out that, although “Congress has frequently legislated on [the subjects of torture and war crimes] in such statutes as the TVPA, the Military Commissions Act, 10 U.S.C. § 948a et seq., the federal torture statute, 18 U.S.C. 2340-2340A, the War Crimes Act, 18 U.S.C. § 2441, and the Uniform Code of Military Justice, 10 U.S.C. § 801 et seq.,” it has never created a cause of action for victims of torture committed by private contractors. 580 F.3d at 16. But again, these facts are of little moment here because this case involves state actors, not private contractors, and all of the statutes cited in Saleh were passed long after the Second Circuit’s landmark decision in Fi *787 lartiga recognized a cause of action for official torture under section 1350. Furthermore, neither the text of the aforementioned statutes nor the coinciding legislative histories indicate any intent by Congress to limit or preempt Filartiga’s interpretation of section 1350. In fact, there are congressional statements to the contrary. See S.Rep. No. 102-249, at 4 (1991) (noting that “[s]ection 1350 has other important uses and should not be replaced” by TVPA); H.R.Rep. No. 102-367, at 3 (1991), reprinted in 1992 U.S.C.C.A.N. 86 (same); 151 Cong. Rec. 30,757 (2005) (statement of Sen. McCain) (noting that torture-related provisions of the Detainee Treatment Act, which were re-passed as part of the 2006 MCA, “do not eliminate or diminish any private right of action otherwise available”).
Finally, although this court in Sanchez-Espinoza v. Reagan, 770 F.2d 202, 206-07 (D.C.Cir.1985), appeared to hold that no suits can be brought under section 1350 against U.S. officials in their personal capacities, Congress superseded this holding when it passed the Westfall Act. Sanchez-Espinoza is inapposite because the court dismissed the plaintiffs’ claims in that case on the ground of common law immunity. We know, however, that Congress may override a judicial decision resting on a common law principle. See City of Milwaukee v. Illinois, 451 U.S. 304, 315, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (“[T]he question [is] whether the legislative scheme spoke directly to a question ... not whether Congress had affirmatively proscribed the use of federal common law.” (quotation omitted)); see also id. at 317 (“[W]e start with the assumption that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law.” (footnote and internal quotation marks omitted)). Congress did just that when it passed the Westfall Act.
The Westfall Act “limits the relief available to persons injured by Government employees acting within the scope of their employment.” United States v. Smith, 499 U.S. 160, 161, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991). However, what is significant here is that the Westfall Act excepts from its grant of immunity all civil actions “brought for a violation of the Constitution of the United States” or “brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized.” 28 U.S.C. § 2679(b)(2)(A), (b)(2)(B).
In my view, Congress’ decision to overrule Westfall v. Erwin, 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988), and to codify the official immunity doctrine, including the section 2679(b)(2)(A) and (b)(2)(B) exceptions — which are explicit waivers of immunity — clearly preempted any preexisting common law applications of immunity with respect to the same matters. See Westfall, 484 U.S. at 300, 108 S.Ct. 580 (“Congress is in the best position to provide guidance for the complex and often highly empirical inquiry into whether absolute immunity is warranted in a particular context.”). There is no qualifier to section 2679(b)(2)(B) for situations in which “the basis for jurisdiction requires action authorized by the sovereign as opposed to private wrongdoing,” Sanchez-Espinoza, 770 F.2d at 207, nor is there any indication in the legislative history that Congress intended for such an exception to apply, H.R. Rep. 100-700 (1988), reprinted in 1988 U.S.C.C.A.N. 5945. The availability of immunity from section 1350 actions therefore depends on the application of the Westfall Act.
C. Does the Westfall Act Bar Claims Asserting Official Torture?
Federal courts, with “great caution,” are authorized by statute to recognize a cause *788 of action under section 1350 for “definite” and “accepted]” violations of the law of nations. Sosa, 542 U.S. at 732, 124 S.Ct. 2739. The United States has consistently and repeatedly condemned the use of official torture. And it is undisputed that “deliberate torture perpetrated under col- or of official authority violates universally accepted norms of the international law of human rights, regardless of the nationality of the parties.” Filartiga, 630 F.2d at 878. However, in order for appellants’ suits for official torture to proceed, they must fall within the Westfall Act’s exception for actions “brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized.” 28 U.S.C. § 2679(b)(2)(B) (emphasis added).
The answer to the question whether the Westfall Act bars appellants’ claims turns on how section 1350 is viewed. There are at least two possible constructions of the ATS:
(1) the ATS is a statute that merely serves as a jurisdictional vehicle for violations of the law of nations; or
(2) the ATS itself incorporates the law of nations and furnishes jurisdiction over causes of action based on violations of definite and accepted principles under the law of nations.
If the latter construction is correct, it follows that section 1350 is capable of being violated. This is not an easy issue, and I would be naive to suggest otherwise. But because I conclude that the ATS incorporates the law of nations, I believe that it is a “statute” that fits the Westfall Act exception.

1. The ATS “Incorporates” the Law of Nations, and It Would Be Ironic To Conclude Otherwise

The Court in Sosa made clear that section 1350 differs from other jurisdictional statutes, such as 28 U.S.C. § 1331, because it allows courts to entertain claims derived from the law of nations. See Stephen Satterfield, Note, Still Crying Out for Clarification: The Scope of Liability Under the Alien Tort Statute After Sosa, 77 Geo. Wash. L. Rev. 216, 221-22 (2008) (deeming section 1350 an “ ‘interactive’ jurisdictional statute” because it “laid the jurisdictional foundation that allowed the newly formed district courts to hear causes of action arising under the law of nations”). As the Court says in Sosa, “the ATS was meant to underwrite litigation of a narrow set of common law actions derived from the law of nations.” 542 U.S. at 721, 124 S.Ct. 2739. Therefore, pursuant to the ATS, federal courts have an obligation to recognize causes of action based on clear and definite violations of the law of nations. And, as the Court noted, the law of nations may be enforced under section 1350 “without further statutory authority.” Id. at 729, 124 S.Ct. 2739 (emphasis added).
In assessing the ATS, Sosa read the Court’s precedents to hold that
• “United States courts apply international law as a part of our own in appropriate circumstances”;
• “International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination”; and
• “The Court is bound by the law of nations which is a part of the law of the land.”
Sosa, 542 U.S. at 729-30, 124 S.Ct. 2739 (brackets and citations omitted). As Judge William A. Fletcher has noted, “[t]he Court’s decision [in Sosa ] ... necessarily implies that the federal common law of customary international law is federal law in the supremacy-clause sense.” William A. Fletcher, International Human Rights in American Courts, 93 Va. L. *789 Rev. 653, 665 (2007). To me, this indicates that section 1350 itself effectively incorporates the law of nations.
My line of analysis can be disputed. What cannot be doubted, however, is that it would be ironic to conclude that the Westfall Act bars claims resting on allegations of official torture. Under the majority’s approach, despite the fact that torture has long been illegal under United States law, see supra, a United States official who tortures a foreign national in a foreign country is not subject to suit in an action brought under section 1350, whereas a foreign official who tortures a foreign national in a foreign country may be sued under section 1350. E.g., Filartiga, 630 F.2d 876 (allowing action to proceed under section 1350 against Paraguayan official for torture committed in Paraguay).
This is a bizarre result, because, in enacting the Westfall Act, Congress apparently meant only to immunize common-law torts against federal officials. See H.R.Rep. No. 100-700, at 2 (1988), reprinted in 1988 U.S.C.C.A.N. 5945, 5945 (noting that purpose of bill was to “provide immunity for Federal employees from personal liability for common law torts committed within the scope of them employment” (emphasis added)); id. at 6, reprinted in 1988 U.S.C.C.A.N. at 5950 (“Common law torts are the routine acts or omissions which occur daily in the course of business and which have been redressed in an evolving manner by courts for, at least, the last 800 years.”); see generally Karen Lin, Note, An Unintended Double Standard of Liability: The Effect of the Westfall Act on the Alien Tort Claims Act, 108 Colum. L. Rev. 1718, 1740-45 (2008) (arguing that Congress only intended the Westfall Act to apply to state-law torts). Indeed, the Supreme Court’s decision in Westfall v. Erwin, 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988), which Congress specifically overruled in passing the Westfall Act, addressed immunity in the context of a common-law negligence suit against federal employees. There is no evidence to indicate that Congress meant to address or foreclose actions under section 1350 brought against federal officials for torture; clear violations of the law of nations, such as torture, are not akin to the types of “routine acts or omissions” that Congress appears to have had in mind. Therefore, it is ironic, to say the least, that “[t]he Westfall Act ... has proved to be a practically ‘impenetrable shield’ for [ATS] claimants against individual U.S. officials.” Lin, 108 Colum. L. Rev. at 1736-37.

2. Deconstructing the Westfall Act

The Westfall Act provides as follows:
The remedy against the United States provided by [the Federal Tort Claims Act] for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee’s estate is precluded without regard to when the act or omission occurred.
28 U.S.C. § 2679(b)(1) (emphases added). In sum, the Westfall Act prohibits civil suits against U.S. employees in their individual capacities arising out of the scope of their employment.
As noted above, however, the Westfall Act excepts from its grant of immunity all civil actions “brought for a violation of the Constitution of the United States” or *790 “brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized.” 28 U.S.C. § 2679(b)(2)(A), (b)(2)(B).
Appellants argue that their section 1350 claims fall within the Westfall Act’s exception for “violationfs] of a statute of the United States under which such action[s] against an individual [are] otherwise authorized.” ' 28 U.S.C. § 2679(b)(2)(B). In response, the Government relies on the Supreme Court’s decision in United States v. Smith, 499 U.S. 160, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991), to support the proposition that “this exception to the Westfall Act ... [applies] only to federal statutes that provide both a cause of action and the substantive law which the employee is alleged to have violated.” Appellees’ Br. at 47 (emphasis in original). The Government also refers to the Ninth Circuit’s decision in Alvarez-Machain v. United States, 331 F.3d 604 (9th Cir.2003) (en banc), rev’d on other grounds sub nom. Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).
The Ninth Circuit concluded that “a claim under the [ATS] is based on a violation of international law, not of the [ATS] itself.” 331 F.3d at 631. Several district courts have followed this line of analysis. See, e.g., Al-Zahrani v. Rumsfeld, 684 F.Supp.2d 103, 114-16 (D.D.C.2010); Rasul v. Rumsfeld, 414 F.Supp.2d 26, 37-38 (D.D.C.2006) (issue not appealed); Bancoult v. McNamara, 370 F.Supp.2d 1, 9-10 (D.D.C.2004). In my view, these decisions are flawed, because they fail to acknowledge a critical distinction between the Gonzalez Act — the statute at issue in Smith — and section 1350.
The Gonzalez Act, like the Westfall Act, is a grant of federal employee immunity. Specifically, it provides that “in suits against military medical personnel for torts committed within the scope of their employment, the Government is to be substituted as the defendant.” Smith, 499 U.S. at 162, 111 S.Ct. 1180 (citing 10 U.S.C. § 1089(a), (b)). In Smith, the plaintiffs sued a U.S. military physician for negligence in federal court, and the United States sought to substitute itself for the physician under the Westfall Act. The plaintiffs objected, arguing that their claim would have been permitted under the Gonzalez Act due to an implicit exception in that statute, and that, as a result, the claim should be exempted from Westfall Act immunity due to § 2679(b)(2)(B)’s exception for claims brought pursuant to a federal statute. The Supreme Court disagreed, holding that: “[njothing in the Gonzalez Act imposes any obligations or duties of care upon military physicians. Consequently, a physician allegedly committing malpractice under state or foreign law does not ‘violate’ the Gonzalez Act.” Smith, 499 U.S. at 174, 111 S.Ct. 1180.
The Court’s decision in Smith seems plainly inapposite here. In contrast to the Gonzalez Act, section 1350 is a statute enabling the federal courts to impose liability — not limit liability. Because section 1350 expressly incorporates the “law of nations,” it is a statute that can be violated.
3. The ATS Is Not a Jurisdictional Statute Akin to Section 1331 — It Is Therefore a “Statute” Sufficient To Satisfy the Westfall Act Exception
The Supreme Court emphasized in Sosa that, in comparing the ATS with the grant of federal-question jurisdiction, 28 U.S.C. § 1331, “[sjection 1350 was enacted on the congressional understanding that courts would exercise jurisdiction by entertaining some common law claims derived from the law of nations; and we know of no reason to think that federal-question jurisdiction was extended subject to any comparable *791 congressional assumption.” 542 U.S. at 731 n. 19, 124 S.Ct. 2739. Thus, if Congress repealed section 1350, federal courts would have no authority today to recognize common law causes of action for violations of customary international law, such as torture. See Mohamad v. Rajoub, 634 F.3d 604, 609-10 (D.C.Cir.2011) (holding that appellant had no cause of action for violation of customary international law pursuant to 28 U.S.C. § 1331); see also Sosa, 542 U.S. at 712, 124 S.Ct. 2739 (“[W]e think that at the time of enactment [of the ATS] the jurisdiction enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law”). This makes section 1350 inherently different from other jurisdictional statutes, such as section 1331, and quite different from the Gonzalez Act. See generally Satterfield, 77 Geo. Wash. L. Rev. at 221-22; William S. Dodge, Bridging Erie: Customary International Law in the U.S. Legal System After Sosa v. Alvarez-Machain, 12 Tulsa J. Comp. & Int’l L. 87, 97-100 (2004) (analyzing Sosa’s discussion of congressional intent in enacting section 1350 as compared to section 1331).
Section 1350 parallels section 301(a) of the Labor Management Relations Act of 1947. Section 301(a) provides that
Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
29 U.S.C. § 185(a). In Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), the Supreme Court held that section 301(a) “authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements,” 353 U.S. at 451, 77 S.Ct. 912 — despite the fact that the plain text of this provision only speaks to federal jurisdiction. See also Sosa, 542 U.S. at 726, 124 S.Ct. 2739 (citing Lincoln Mills as an example of a “haven” of federal common law). Just as section 301(a) provides jurisdiction and allows federal courts to create federal common law to enforce collective bargaining agreements, section 1350 provides jurisdiction and allows federal courts to create a federal common law remedy for definite and accepted violations of customary international law. In other words, it is section 1350, not international law, that gives federal courts the authority to enforce “international norms that a federal court c[an] properly recognize as within the common law enforceable without further statutory authority.” Sosa, 542 U.S. at 729, 124 S.Ct. 2739 (emphasis added). This makes section 1350 “statutory authority” sufficient to satisfy the Westfall Act exception.
It might be argued that Smith should be read to bar the Westfall Act exception from applying here, because section 1350 does not explicitly incorporate the law of nations. That was the view taken by the Ninth Circuit, even as that court acknowledged that the Gonzalez Act and section 1350 have very different purposes. See Alvarez-Machain, 266 F.3d at 1054. Although this argument is not without force, I disagree. Like section 301(a), as interpreted by the Court in Lincoln Mills, a federal statute may incorporate enforceable substantive rights even though the statute does not spell out the details of those rights. It is true that Sosa says that, since Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), “the general practice has been to look for legislative guidance before exer *792 cising innovative authority over substantive law,” Sosa, 542 U.S. at 726, 124 S.Ct. 2739; but Sosa opened the door to the recognition of causes of action alleging wrongs — such as official torture — that violate the law of nations.
In short, I believe that Smith has no application here, because, as noted above, Smith was focused on the Gonzalez Act, not section 1350. Unlike the Gonzalez Act, section 1350 is a statute authorizing the federal courts to impose liability — not limit liability. I therefore conclude that section 1350 fits within the exception to the Westfall Act for “violation[s] of a statute of the United States under which such action[s] against an individual [are] otherwise authorized,” 28 U.S.C. § 2679(b)(2)(B). Accordingly, I dissent from the majority’s disposition of appellants’ claims under section 1350.
III. CONCLUSION
Twenty-seven years ago, in Tel-Oren, I said that “[t]his case deals with an area of the law that cries out for clarification by the Supreme Court.” 726 F.2d at 775. I say the same again here.
I thought that the Court’s decision in Sosa afforded the lower federal courts the amplification and clarification necessary to understand how to process claims properly brought under section 1350. Obviously, I was mistaken. Some of my colleagues on the federal bench believe that the Westfall Act takes away what the ATS gives insofar as it allows causes of action against state actors who perpetrate torture under the color of official authority. Ultimately, after careful consideration of this difficult question, I think the decisions that have endorsed this approach are misguided.
Even if ATS actions against state actors were barred by principles of common law immunity, as this court thought in Sanchez-Espinoza, I believe that Congress vitiated that immunity when it enacted the Westfall Act. In my view, Congress’ decision to overrule Westfall v. Erwin, 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988), and to codify the official immunity doctrine, including the 28 U.S.C. § 2679(b)(2)(A) and (b)(2)(B) exceptions— which are explicit waivers of immunity— clearly preempted any preexisting common-law applications of immunity with respect to the same matters. And I believe that actions that are cognizable under section 1350 — such as allegations of official torture — fall within the Westfall Act’s exception for “violation[s] of a statute of the United States under which such action[s] against an individual [are] otherwise authorized.” Id. § 2679(b)(2)(B). On this last point, I agree with Judge Fletcher that Sosa “necessarily implies that the federal common law of customary international law is federal law in the supremacy-clause sense.” William A. Fletcher, International Human Rights in American Courts, 93 Va. L. Rev. 653, 665 (2007). For me this means that it is section 1350, not international law, that gives federal courts the authority to enforce international norms that a federal court can properly recognize as within the common law enforceable “without further statutory authority.” Sosa, 542 U.S. at 729, 124 S.Ct. 2739 (emphasis added). As I see it, section 1350 is “statutory authority” sufficient to satisfy the Westfall Act exception. Some may disagree with my analysis, but at this point I cannot see why.
As I noted above, I think it is fair to say that the developing case law is ironic. As one commentator has noted:
In the past thirty years, the [ATS] has become an important instrument in advancing human rights claims before U.S. courts. In light of this exceptional statute, the Westfall Act’s effect of immunizing U.S. officials is doubly ironic: Not only has the country that led the way in allowing aliens to vindicate their rights *793 against foreign officials maintained official immunity for its own officials even in the face of modern human rights accountability, but it has also done so unintentionally. As a result, U.S. courts apply a double standard of liability whereby foreign officials may face liability for international law violations while U.S. officials have absolute immunity for those same violations.
Karen Lin, Note, An Unintended Double Standard of Liability: The Effect of the Westfall Act on the Alien Tort Claims Act, 108 Colum. L. Rev. 1718, 1719 (2008) (footnotes omitted).
I do not agree with the courts that have helped to create this irony by granting immunity to United States officials from ATS actions. It is hard to fathom why Congress would pass a law that makes all government officials — except our own— subject to liability for torture committed overseas. There is nothing to indicate that Congress meant to achieve this result when the Westfall Act was passed. Maybe it is time for Congress to give the judiciary better directions on this matter.