

NUMBER 13-14-00726-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

LATASHA FREEMAN,                                                    Appellant,

v.

AMERICAN K-9 DETECTION
SERVICES, L.L.C. AND HILL
COUNTRY DOG CENTER, L.L.C.,                                        Appellees.

**On appeal from the 198th District Court
of Bandera County, Texas.**

# O P I N I O N

**Before Justices Garza, Benavides and Longoria
Opinion by Justice Garza**

This case involves personal injuries allegedly caused by a contract working dog ("CWD") on a United States military base in Afghanistan. Appellant LaTasha Freeman argues that the trial court erred in granting a plea to the jurisdiction dismissing her suit against appellees, American K-9 Detection Services, LLC ("AMK9") and Hill Country Dog

Center, LLC ("HCDC").  We reverse and remand.[1]

## I. BACKGROUND

Freeman was employed as an administrative clerk by Honeywell International, Inc., a private military contractor that provided support to the United States Army's operations at Camp Mike Spann, a forward operating base in Afghanistan.  AMK9 is a Florida corporation that trains and deploys military working dogs and their handlers; HCDC is a Texas corporation that also trains dogs for government work.

In her petition, Freeman alleged that, on or about November 9, 2011, while in the course and scope of her employment at Camp Mike Spann, she was attacked by an unprovoked CWD owned by AMK9 and "negligently left unattended" by its handler, an AMK9 employee.  She alleged that the dog at issue, named Callie or Kallie, was "trained, certified, received veterinary services, and/or were purchased" by AMK9 from HCDC in Bandera County, Texas; that the dog's handler "while stationed overseas" was "trained, managed, and employed" by AMK9; and that HCDC also trained the handler.  Freeman alleged that AMK9 was negligent for failing to properly train the dog, failing to properly train the dog's handler, failing to keep the dog under restraint, leaving the dog unattended, and failing to secure the kennel in which the dog was being held.  She also raised theories of negligence per se and strict liability as to AMK9.  As to HCDC, Freeman contended that it was negligent for failing to properly train the dog, failing to properly train the handler, and failing to provide the handler with proper equipment.  She requested damages for lost wages, medical expenses, pain and suffering, mental anguish, physical impairment

---

[1] This appeal was transferred from the Fourth Court of Appeals pursuant to a docket-equalization order issued by the Texas Supreme Court.  *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2015 R.S.).

and disfigurement, and loss of enjoyment of life, both in the past and in the future.

AMK9 filed an answer asserting, among other things, that its actions were not a proximate cause of Freeman's injuries. AMK9 also filed a plea to the jurisdiction alleging that it was immune to suit due to its status as a private defense contractor. In particular, AMK9 asserted that it is immune "under four separate theories: the 'Political Question' Doctrine, the Combat Activities Exclusion of the Federal Tort Claims Act, the Derivative Immunity Doctrine, and the preemption provided by the Defense Production Act of 1950."

AMK9 later filed a motion for leave to designate the United States Army ("Army") and/or the United States Department of Defense ("DOD") as responsible third parties "to the extent that [Freeman] claims that the failure to control the CWD was tortious or otherwise somehow the cause of her injury." According to AMK9, the Army negligently designed and built the pen in which the dog was held at the time of the incident.

The trial court granted AMK9's plea to the jurisdiction without specifying its grounds and dismissed the suit as to both defendants. It later granted AMK9's motion to designate responsible third parties. This appeal followed, in which Freeman contends by three issues that the trial court erred by (1) dismissing her suit against AMK9 and HCDC pursuant to the plea to the jurisdiction, (2) doing so without giving her the opportunity to replead, and (3) granting AMK9's motion to designate responsible third parties.

## II. SUBJECT MATTER JURISDICTION

### A. Standard of Review

A plea to the jurisdiction is a dilatory plea used to defeat a cause of action without regard to whether the claims asserted have merit. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). The plea challenges the trial court's subject matter

jurisdiction. *Id.*; *see Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999). Whether a trial court has subject matter jurisdiction and whether the pleader has alleged facts that affirmatively demonstrate the trial court's subject matter jurisdiction are questions of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex. 2002).

The plaintiff has the initial burden to plead facts affirmatively showing that the trial court has jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993); *Univ. of N. Tex. v. Harvey*, 124 S.W.3d 216, 220 (Tex. App.—Fort Worth 2003, pet. denied). We construe the pleadings liberally in favor of the pleader, look to the pleader's intent, and accept as true the factual allegations in the pleadings. *See Miranda*, 133 S.W.3d at 226, 228. If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction, but do not affirmatively demonstrate incurable defects in jurisdiction, the plaintiff should be afforded the opportunity to amend its pleadings. *Id.* at 226–27.

Where the plea to the jurisdiction challenges the existence of jurisdictional facts, as here, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, even when the evidence implicates the merits of the cause of action. *Id.* at 227; *Blue*, 34 S.W.3d at 555; *see City of Waco v. Kirwan*, 298 S.W.3d 618, 622 (Tex. 2009). A review of a plea to the jurisdiction challenging the existence of jurisdictional facts mirrors that of a traditional motion for summary judgment. *Miranda*, 133 S.W.3d at 228. The defendant is required to meet the summary judgment standard of proof for its assertion that the trial court lacks jurisdiction. *Id.* Once the

4

defendant meets its burden, the plaintiff is then required to show that there is a disputed material fact regarding the jurisdictional issue. *Id.* If the evidence creates a fact question regarding jurisdiction, the trial court must deny the plea to the jurisdiction and leave its resolution to the fact finder. *Id.* at 227–28. But, if the evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228. In considering this evidence, we "take as true all evidence favorable to the nonmovant" and "indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Id.*

Because the trial court did not specify the grounds upon which it granted the plea, we will sustain the judgment if it is correct on any theory of law applicable to the case and supported by the record. *Tarkington Indep. Sch. Dist. v. Aiken*, 67 S.W.3d 319, 327 (Tex. App.—Beaumont 2002, no pet.).

## B. Evidence

In support of its plea, AMK9 filed several affidavits, including that of Willard Chipman, who stated that he served as AMK9's Assistant Program Manager of Operations in Afghanistan prior to October 2012. Chipman further stated:

5. From my work with AMK9, I am knowledgeable about the nature of the services provided by AMK9 under our contract with the U.S. Department of the Army providing Contract Working Dog ("CWD") Team services in Afghanistan in November 2011 (Contract) and the interplay with the U.S. Department of the Army.

6. It is my understanding the Department of Defense has assigned AMK9's Contract a priority rating of "DO-C9." . . .

7. AMK9 personnel on the Contract are subject to the command of the U.S. Army personnel at Camp Mike Spann in the performance of their duties. Under AMK9's Contract with assigned priority rating "DO-C9" and covering Camp Mike Spann, the Army was specifically required to provide kennel facilities for use by AMK9's CWDs[.] Designation of the contract kennels was the sole responsibility of the site Military

5

Working Dog Program Manager. AMK9 did not provide the kennels Kallie allegedly escaped from which were in place at Camp Mike Spann, did not design them, and did not construct them. As per the Contract, they were provided by the U.S. Army based upon their own design and construction techniques for use by AMK9's CWDs located at Camp Spann; it is my understanding AMK9 was not consulted in the building of the kennels, including the decision to not take the center divider to the ceiling. AMK9 personnel were instructed to use them by the military authorities as a part of their CWD duties on the base. AMK9 personnel were following the commands of the U.S. Army when placing the CWD in the kennel from which Kallie allegedly escaped prior to the alleged incident involving Latasha Freeman.

In response, Freeman produced, among other evidence, her affidavit describing the events at issue as follows:

Around noon on November 9, 2011, I was with a coworker waiting outside by the entry control point 1, a gate at Camp Mike Spann, for vehicles to arrive through a security checkpoint, so that I could escort the vehicles back to [the] area where they were to be parked. I was standing about 45-50 feet away from an animal shelter. I had been standing waiting for the vehicles for about 10 minutes when I noticed a leash hanging on the latch of the shelter door. I could see the legs of a dog through the shelter door that was partially open. I then saw the dog push the [sic] open and walk through the door. I didn't see any AMK9 handlers around the kennel area.

When I saw the dog outside the shelter it started looking around the area where I was standing. The dog started running towards me and jumped at the back of my left shoulder. While the dog was attacking me, she bit my left back shoulder and tried to bite the left side of my face. When she jumped up again I threw my left arm up to protect myself and she clamped down on my left forearm and shook my left arm violently back and forth. The dog then jumped down and bit me on the outside of my left thigh. Then she bit my right buttocks and pulled my pants down with her teeth exposing my buttocks. Then a local civilian contractor pulled the dog off of me by the collar and took the dog away.

I never saw the AMK9 handler for the dog that attacked me until after the attack. At that time, I saw the AMK9 handler with the dog that attacked me on a leash standing outside the building. I then observed the AMK9 handler put the dog into the shelter and shut the door without himself going inside the shelter. I also saw another AMK9 handler who had been inspecting vehicles with his dog also put his dog into this shelter shortly after and also shut the door.

Freeman also produced an email she received from R. Keith Dorough, an AMK9

6

project manager.  The email states in part:

> I would like to personally apologize for the incident involving "Callie."  The Army guys had built new kennels inside the building at the ECP, Callie jumped over the divider into the opened kennel and exited the building through the opened door.  Tops have been put on the kennels and the handler was reprimanded.
>
> Callie is a very playful dog and the soldiers play with her and the other dogs on a daily basis, I can assure you she was just trying to play with you, the soldiers play tug a war and the dogs will mouth them as well as jumping around, I understand this does not make you feel any better and you were not interested in playing with the dog, this was an unfortunate and inexcusable incident, I just wanted you to understand that you were not "attacked" as some are trying to portray the incident, when these dogs are given the command attack, there are serious injuries to follow, I have personally worn the bite suit during training for Callie and when she bites, it is serious.  I in no way want to under play the incident as I have stated it was inexcusable, at the same time I want to make sure it[']s not over played as well.

Freeman additionally produced a "Mission/Incident/Accident Report" form promulgated by AMK9 relating to the incident at issue.  The report described the incident as follows:

> K9 Kallie was in her place of holding at ECP 1, with her handler Frans standing outside of the shelter.  The Other handler was busy with a sweep on a vehicle.  K9 Kallie managed to jump over the divider between the two holding spaces and come out the door on the other side, which was open at the time.  K9 Kallie ran out the door and immediately made her way to Frans when she saw another person (Latasha Freeman) standing outside.
>
> In her playful yet rough manner she ran over to her, at this time Frans had noticed this and was in process of getting her under control.  She briefly jumped up against above mentioned to play and seek attention but in doing so snapped her jaw and punctured the left front sleeve of Latasha Freeman's jacket.  There was no injury to her as person [sic].

Under "Analysis," the report stated:  "This was an unexpected incident that has not occurred as yet.  Handlers will have to ensure that both doors of the shelter are closed at all times."

**C.** **Jurisdiction Over Claims Against AMK9**

As noted, AMK9 asserted in its plea that the trial court lacked subject matter jurisdiction under: (1) the political question doctrine; (2) the combatant activities exception to the waiver of immunity provided in the Federal Tort Claims Act ("FTCA"), (3) the doctrine of derivative immunity, and (4) the Defense Production Act of 1950.

**1.** **Political Question Doctrine**

Under the political question doctrine, a case presents a non-justiciable political question when one of the following characteristics is "inextricable" from the case: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department"; (2) "a lack of judicially discoverable and manageable standards for resolving it"; (3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion"; (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government"; (5) "an unusual need for unquestioning adherence to a political decision already made"; or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 465 (3d Cir. 2013) (citing *Baker v. Carr*, 369 U.S. 186, 217 (1962)); *Lane v. Halliburton*, 529 F.3d 548, 558 (5th Cir. 2008); *see Goldberg v. Comm'n for Lawyer Discipline*, 265 S.W.3d 568, 576 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (noting that a trial court lacks jurisdiction over a non-justiciable controversy).

In *Harris*, an Army staff sergeant died by electrocution while taking a shower in his barracks in Iraq. 724 F.3d at 463. His estate sued KBR, the military contractor that was

allegedly responsible for maintaining the barracks, alleging that KBR negligently installed and maintained a water pump at the barracks. *Id.* KBR asserted, and the trial court agreed, that the suit raised a non-justiciable political question and was pre-empted by the policy embodied in the combatant-activities exception to the waiver of governmental immunity in the FTCA.[2] *Id.* In reviewing the ruling, the Third Circuit Court of Appeals remarked:

> Defense contractors do not have independent constitutional authority and are not coordinate branches of government to which we owe deference. Consequently, complaints against them for conduct that occurs while they are providing services to the military in a theater of war rarely, if ever, directly implicate a political question. Nonetheless, these suits may present nonjusticiable issues because military decisions that are textually committed to the executive sometimes lie just beneath the surface of the case. For example, a contractor's apparently wrongful conduct may be a direct result of an order from the military, or a plaintiff's contributory negligence may be directly tied to the wisdom of an earlier military decision. In these situations, the political question appears not from the plaintiff's claims but from the broader context made relevant by a contractor's defenses. As such, to avoid infringing on other branches' prerogatives in war-time defense-contractor cases, courts must apply a particularly discriminating inquiry into the facts and legal theories making up the plaintiff's claims as well as the defendant's defenses.

*Id.* at 465–66 (citations omitted). The Court continued: "Because defense contractors are not coordinate branches of government, a determination must first be made whether the case actually requires evaluation of military decisions. If so, those military decisions must be of the type that are unreviewable because they are textually committed to the executive." *Id.* at 466. There, KBR argued that the claims against it "would require judicial review of the military's decisions about where to house soldiers on a battlefield— decisions that are unreviewable because they involve strategic calculi about how best to

---

[2] We address the issue of whether the FTCA's combatant-activities exception operates to preempt Freeman's claims *infra* section II.C.2.

defend against threats." *Id.*

The *Harris* court noted that "[m]ilitary control over a contractor's actions is one common way that evaluation of strategic military decisions becomes necessary." *Id.* (noting that "[m]ilitary control requires evaluation of military decisions because if the contractor is simply doing what the military ordered it to do, then review of the contractor's actions necessarily includes review of the military order directing the action"). In that case, due to the "lack of detailed instructions in the work orders and the lack of military involvement in completing authorized work orders," military control did not introduce an unreviewable military decision into the case. *Id.* at 467. Nevertheless, the court held that the plaintiff's claims "might still present unreviewable military decisions if proving those claims or KBR's defenses necessarily requires evaluating such decisions." *Id.*

After thoroughly reviewing the claims and defenses raised by the pleadings and evidence, the court held that, depending on which state's law was applied by the trial court, KBR's "contributory negligence and proximate cause defenses may present nonjusticiable issues." *Id.* at 469. In *Harris*, the trial court had not yet determined whether Pennsylvania, Tennessee, or Texas law applied. As to KBR's proximate-cause defense (in which it argued that the military's actions were a proximate cause of the soldier's death), the appeals court noted:

> If a jurisdiction uses a proportional-liability system which assigns liability by the degree of fault, then a proximate-cause defense introduces a nonjusticiable issue. In such a system, there is simply no way to determine damages without evaluating military decisions. The fact finder cannot decide the respective degrees of fault as between a military contractor . . . and the military without evaluating the decisions made by each—particularly, the military's decisions to house troops in unsafe barracks that would not be repaired.

*Id.* at 474. Tennessee and Texas use proportional-liability systems. *Id.* (citing TEX. CIV.

10

PRAC. & REM. CODE ANN. § 33.004 (West, Westlaw through 2015 R.S.)). Accordingly, if the law of either of those two states applied, "then damages cannot be estimated without evaluating unreviewable military decisions." *Id.* On the other hand, if Pennsylvania law applied, then "calculation of damages does not require evaluating strategic military decisions because the plaintiffs are free to obtain the entirety of their relief from [the contractor]." *Id.* The court further held that the question of whether KBR's contributory-negligence defense presented a non-justiciable issue also turned on the applicable state law. *Id.* at 475 (stating that "[t]o determine whether [the soldier's] alleged negligence caused more than 50 percent of the harm, the degree of causation that can be assigned as between the military's alleged negligence and KBR's alleged negligence must also be determined. . . . This assignment of fault to the military inevitably would require evaluating the wisdom of the strategic military decisions that caused the death"); *see id.* at 477 (observing that, although the military was not a party in the case, Tennessee and Texas law "permit fault to be assigned to nonparties for the purposes of contributory negligence"). The court remanded for a determination of which state's law to apply. *Id.*

AMK9, relying in large part on *Harris*, contended in a brief supporting its plea to the jurisdiction that Freeman's claims against it are non-justiciable because:

> AMK9 had no involvement in the design of the kennel, and was not asked to and had no involvement in the building of the kennel. The entire matter was in the hands of the Army. . . . The Army designed and built the kennel in such a way that the divider between the two dog pens did not reach the roof. . . . While AMK9 had no notice that the CWD in question would be able to scale the divider and slip out through the adjoining pen, the question of whether the Army properly designed and built the kennel is an integral part of AMK9's defense in this case. Therefore, as part of the case, this Court (and/or the jury) is going to have to "analyze the military's judgment" in the design and building of the kennel.

We disagree. AMK9 is asserting a "proximate cause defense" such as that raised by KBR

11

in *Harris*. That is, it is alleging that the negligence of the Army proximately caused Freeman's injuries, at least in part. But when analyzing whether a proposed defense implicates a non-justiciable issue, "courts must first decide whether the defendant has 'present[ed] sufficient evidence to permit a jury to conclude that he established the [elements of the] defense by a preponderance of the evidence.'" *Id.* at 469 (quoting *United States v. Stewart*, 185 F.3d 112, 125 (3d Cir. 1999)). On the other hand, "if there is insufficient evidence to support the defense, or if the defense does not present a nonjusticiable issue, then the case goes forward." *Id.*

Proximate causation is comprised of both cause-in-fact and foreseeable harm. *See, e.g., Transcont'l Ins. Co. v. Crump*, 330 S.W.3d 211, 222 (Tex. 2010). Here, AMK9 has arguably established through Chipman's affidavit that the Army's design and construction of the kennel at issue—in particular, the fact that the dividers separating the various pens within the kennel did not extend to the ceiling—was a cause-in-fact of Freeman's injuries. That is because, had the Army designed and built the kennel differently such that the dividers between pens extended to the ceiling, the dog would not have been able to "scale the divider and slip out" to "attack" Freeman, notwithstanding the fact that AMK9's handler left the kennel's outer door open. *See id.* at 222–23 ("Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred."). But AMK9 has not presented any evidence establishing that the Army was actually negligent in designing the kennel. *See, e.g., Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006) ("To establish negligence, a party must establish a duty, a breach of that duty, and damages proximately caused by the breach."). Nor has AMK9 produced evidence that the Army,

12

in failing to design and build the kennel such that the pen dividers extended to the ceiling, could have reasonably foreseen that such failure would result in injuries to a person outside the kennel. *See, e.g., D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002) ("Foreseeability exists when the actor as a person of ordinary intelligence should have anticipated the dangers his negligent act creates for others."). *Harris* is distinguishable on these grounds. *See Harris*, 724 F.3d at 471–72 (noting that "from KBR's perspective, the military foresaw the exact harm suffered by [the soldier]" and concluding that KBR "presented sufficient evidence to invoke its proximate-cause defense under Texas law").

We further observe that Freeman's claims against AMK9 were not exclusively based on the dog's escape from the kennel on November 9, 2011. Rather, Freeman additionally claimed in her live pleading that AMK9 "failed to properly train [its] animal handler and [its] CWD to not attack without a command and/or without cause." In our jurisdictional analysis, we must accept as true the factual allegations made in Freeman's pleadings unless AMK9 is able to produce evidence controverting jurisdictional facts. *See Miranda*, 133 S.W.3d at 226, 228. AMK9 has not produced evidence showing either that: (1) contrary to Freeman's pleadings, it properly trained the handler and the CWD; or (2) that judicial determination of whether it properly trained the handler and CWD would "necessarily require" the evaluation of "military decisions" so as to make the claim unreviewable. *See Harris*, 724 F.3d at 467. AMK9 also did not establish that the Army retained any sort of control over AMK9's training methods—in fact, AMK9 concedes that, under its contract, it was "given discretion" in how to train the dogs.

For the foregoing reasons, we find that the political question doctrine does not bar Freeman's claims.

13

## 2. Derivative Sovereign Immunity

The doctrine of sovereign immunity provides that "no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent." *Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex. 2006) (citing *Hosner v. DeYoung*, 1 Tex. 764, 769 (1847)). The FTCA waives sovereign immunity for certain tort claims against the federal government. *See* 28 U.S.C.A. § 2674 (West, Westlaw through P.L. 114-49). However, the FTCA does not waive immunity for claims "arising out of the combatant activities of the military . . . during time of war." 28 U.S.C.A. § 2680(j) (West, Westlaw through P.L. 114-49). Although the issue is disputed by the parties, we will assume for purposes of this opinion that Freeman's suit arises out of "combatant activities . . . during time of war" such that the sovereign immunity of the federal government itself would not be waived by the FTCA. We therefore must next determine whether that immunity extends to AMK9 under the facts of this case.

Contractors and common law agents acting within the scope of their employment for the government generally have derivative sovereign immunity. *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000); *see Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20–21 (1940) (noting that "there is no liability on the part of the contractor for executing [the] will [of Congress]"). However, the Texas Supreme Court has held that a government contractor "is not entitled to sovereign immunity protection unless it can demonstrate its actions were actions of the [governmental entity], executed subject to the control of the [governmental entity]." *K.D.F. v. Rex*, 878 S.W.2d 589, 597 (Tex. 1994). In other words, "private parties exercising independent discretion are not entitled to sovereign immunity." *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 124 (Tex. 2015) (citing *K.D.F.*, 878

14

S.W.2d at 597).

The Texas Supreme Court, in *Brown & Gay*, recently considered the scope of derivative immunity for government contractors. *See id.* There, the plaintiff claimed that Brown & Gay, a government contractor, negligently designed and constructed a roadway, thereby causing a fatal accident. *Id.* at 121. Brown & Gay argued that it was entitled to derivative immunity as an "employee" of the Fort Bend County Toll Road Authority (the "Authority"), the governmental entity that issued the contract. *Id.* at 120 (citing *Tex. Adjutant General's Office v. Ngakoue*, 408 S.W.3d 350, 356 (Tex. 2013) (explaining that a suit against a government official acting in an official capacity is "merely another way of pleading an action against the entity of which the official is an agent")). The trial court agreed with Brown & Gay and dismissed the case, but the Fourteenth Court of Appeals reversed, holding that Brown & Gay was not entitled to immunity because it was an independent contractor, rather than an employee, of the Authority. *Id.*

The Texas Supreme Court affirmed the court of appeals' decision. *Id.* The Court first reviewed federal case law establishing that derivate immunity is extended to private contractors "only in limited circumstances":

> [I]n *Butters v. Vance International, Inc.*, a female employee of a private security firm hired to supplement security at the California residence of Saudi Arabian royals sued the firm for gender discrimination after being declined a favorable assignment. 225 F.3d 462, 464 (4th Cir. 2000). Although the firm had recommended the employee for the assignment, Saudi military supervisors rejected the recommendation on the grounds that the assignment would offend Islamic law and Saudi cultural norms. *Id.* Concluding that the Saudi government would be immune from suit under the Foreign Sovereign Immunities Act, the Fourth Circuit then considered whether that immunity attached to the security firm. *Id.* at 465. Holding that it did, the court relied on the fact that the firm "was following Saudi Arabia's orders not to promote [the employee]," expressly noting that the firm "would not [have been] entitled to derivative immunity" had the firm rather than the sovereign made the decision to decline the promotion. *Id.* at 466.

This limitation on the extension of immunity to government contractors is echoed in other cases. For example, in *Ackerson v. Bean Dredging LLC*, federal contractors were sued for damages allegedly caused by dredging in conjunction with the Mississippi River Gulf Outlet project. 589 F.3d 196 (5th Cir. 2009). Relying on *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), the Fifth Circuit held that the contractors were entitled to immunity for their actions taken within the scope of their authority for the purpose of furthering the project. 589 F.3d at 206–07, 210. Notably, however, the court found significant that the plaintiffs' allegations "attack[ed] Congress's policy of creating and maintaining the [project], not any separate act of negligence by the Contractor Defendants." *Id.* at 207 (emphasis added); *see also Yearsley*, 309 U.S. at 20 (holding that a contractor directed by the federal government to construct several dikes was immune from claims arising from the resulting erosion and loss of property when the damage was allegedly caused by the dikes' existence, not the manner of their construction).

We cited *Yearsley* in a case involving a city contractor hired to build sewer lines along a city-owned easement in accordance with the city's plans and specifications. *Glade v. Dietert*, 156 Tex. 382, 295 S.W.2d 642, 643 (1956). The city had inadvertently failed to acquire the entire easement as reflected in the plans, and the contractor was sued for trespass after bulldozing a portion of a landowner's property. *Id.* While immunity was not at issue in Glade because the city owed the landowner compensation for a taking, we cited *Yearsley* and other case law for the proposition that a public-works contractor "is liable to third parties only for negligence in the performance of the work and not for the result of the work performed according to the contract." *Id.* at 644.

*Id.* at 124–26 (footnote omitted). The Court noted that, in each of the cited cases, "the complained-of conduct for which the contractor was immune was effectively attributed to the government. That is, the alleged cause of the injury was not the independent action of the contractor, but the action taken by the government through the contractor." *Id.* at 125. In *Brown & Gay*, on the other hand, the plaintiffs did not complain of harm caused by Brown & Gay's "implementing the Authority's specifications or following any specific government directions or orders," nor did they complain about the decision to build the roadway at issue or "the mere fact of its existence." *Id.* Instead, the plaintiffs argued that Brown & Gay was "independently negligent in designing the signs and traffic layouts" for

16

the roadway. *Id.* Thus, the supreme court rejected Brown & Gay's "contention that it is entitled to share in the Authority's sovereign immunity solely because the Authority was statutorily authorized to engage Brown & Gay's services and would have been immune had it performed those services itself." *Id.* at 127.[3]

The United States Supreme Court has also weighed in on the limited application of derivative sovereign immunity in the context of military contractors. *See Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988). In *Boyle*, a United States Marine drowned after a helicopter crash and his estate sued the helicopter's designer, a military contractor, claiming that the helicopter's emergency escape hatch was defectively designed. *Id.* at 502. The Court held that

> [l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* at 512. *Boyle* involved a separate exemption to the waiver of immunity provided in the FTCA for discretionary governmental functions. *See id.* at 511 (citing 28 U.S.C.A. § 2680(a)). In *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009), the District of Columbia Court of Appeals applied *Boyle* in the context of the combatant-activities exception. It

---

[3] The *Brown & Gay* Court also noted that the policy rationales underlying the doctrine of sovereign immunity would not be advanced by affording immunity to private contractors. The Court explained that sovereign immunity is "designed to guard against the 'unforeseen expenditures' associated with the government's defending lawsuits and paying judgments 'that could hamper government functions' by diverting funds from their allocated purposes," but "[i]mmunizing a private contractor in no way furthers this rationale." *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 123 (Tex. 2015). The Court explained:

> [e]ven if holding a private party liable for its own improvident actions in performing a government contract indirectly leads to higher overall costs to government entities in engaging private contractors, those costs will be reflected in the negotiated contract price. This allows the government to plan spending on the project with reasonable accuracy.

*Id.*

held that, under the combatant-activities exception, state tort claims are preempted "where a private service contractor is integrated into combatant activities over which the military retains command authority." *Id.* at 10; *see Harris,* 724 F.3d at 480.

Here, the evidence established that the services and "equipment" provided by AMK9—i.e., the CWD and its handler—did not conform to specifications provided by the military. In particular, Freeman alleged that AMK9's handler was negligent in failing to close the outer doors of the kennel, and in support of these allegations, she produced a copy of a "Performance Work Statement" applicable to AMK9's contract with the United States Government. The Performance Work Statement stated in part that AMK9 was required to close doors to facilities "[a]t the close of each work period."[4] Freeman also alleged that AMK9's handler was negligent in failing to train the dog to not attack without provocation and in failing to restrain the dog at the time of the incident, and the Performance Work Statement provided that the training and supervision of the dogs at the forward operating base was solely the responsibility of AMK9's employees.[5] The

---

[4] Specifically, the document provides: "The Contractor is responsible for safeguarding all Government property . . . At the close of each work period, Government facilities, equipment, and materials shall be secured, lights and water turned off, hear or air conditioning set to minimum acceptable temperatures, and all doors and windows secured."

[5] The Performance Work Statement provides in part:

The contractor shall provide sufficient CWD Trainer/Supervisor(s) to oversee all CWD training under this contract.

. . . .

The Kennel Master is in charge of the Contractor's CWD program at the designated FOBs in Afghanistan[ and is r]esponsible for overall management of contract dogs, health, morale and welfare, team utilization, training, and coordination of services to support the program.

. . . .

Each handler is personally responsible for his or her assigned dog. The handler trains, employs, feeds, cares for, cleans, and otherwise maintains his or her assigned dog in every way. The dog depends directly on the handler and, in keeping with the principle of one dog—one handler, the dog should never have to depend on anyone other than the assigned handler. The handler is responsible for the cleaning and maintenance of the dog's kennel. The handler is directly responsible to the Kennel Master for the operation,

18

military did thus not "retain[] command authority" over AMK9's activities with regard to training and supervision of the CWDs at the base. *See Saleh*, 580 F.3d at 10; *Harris*, 724 F.3d at 481 (holding that the military did not retain command authority over KBR's installation and maintenance of the defective water pump because "the relevant contracts and work orders did not prescribe how KBR was to perform the work required of it"). The evidence showed that AMK9 was working under a "performance-based" contract—that is, a contract which "describe[s] the work in terms of the required results rather than either 'how' the work is to be accomplished or the number of hours to be provided." *Saleh*, 580 F.3d at 10. Under *Saleh*, tort suits against contractors working under performance-based contracts are not preempted on the basis of the FTCA's combatant-activities exception. *Id.*

The Performance Work Statement additionally incorporated "Contract Working Dog Certification Standards" which provided in part that CWDs must be trained so as to attack only when commanded.[6] Freeman alleged that AMK9 failed to conform to these

---

maintenance, and cleaning of the kennels, kennel support building, training area, exercise area, obedience course, and any other areas or equipment that are included in the kennel facility.

[6] The Performance Work Statement provides in part:

1.2.  Controlled aggression

  1.2.1.  False run (critical). When commanded to STAY, the CWD must remain in the heel, sit, or down position, on-leash, and not attack when a person approaches the CWD team.

  1.2.2.  False run into a bite (critical). When commanded to STAY, the CWD must remain in the heel, sit, or down position, on-leash, and attack only on the command of GET HIM at which time the dog is taken off leash. The CWD must complete the attack, bite, and hold the decoy, hold with a full mouth bite for at least 10 seconds, and·release on the command OUT. Only 1 verbal correction is authorized and the CWD must release the bite on the second command of OUT. The CWD must return to its handler when commanded to HEEL.

  1.2.3.  Search and attack (critical). When commanded to STAY, the CWD must remain in the heel, down, or sit position while the handler searches a decoy

19

specifications and the evidence did not controvert these allegations; accordingly, under *Boyle*, AMK9 is not entitled to derivative immunity. *See Boyle*, 487 U.S. at 512. This is not a suit, like the one in *Ackerson*, complaining generally about congressional or military policy; nor is it a suit, like the one in *Glade,* seeking to impose liability for a contractor's performance of work in accordance with the contract. *See Brown & Gay*, 461 S.W.3d 124–26 (citing *Ackerson*, 589 F.3d at 207; *Glade*, 295 S.W.2d at 644). Instead, it alleges "independent act[s] of negligence" on the part of AMK9, in violation of its contract with the military and in violation of the previously-formulated military policy. *See id.*

We conclude that, under applicable law, AMK9 is not entitled to derivative sovereign immunity as to Freeman's claims.

### 3. Defense Production Act of 1950

The Defense Production Act of 1950 authorizes the Department of Defense to issue so-called "rated order" contracts which, because they are "necessary or appropriate to promote the national defense, shall take priority over performance of any other contract or order . . . ." 50 U.S.C.A. app. § 2071(a) (West, Westlaw through P.L. 114-49); *see Martin v. Halliburton*, 618 F.3d 476, 480 (5th Cir. 2010). The willful failure to perform a

---

off-leash. The search will consist of patting down both arms, both legs, and the torso of the decoy. During the search, the CWD must attack the decoy without command if the decoy tries to escape or attacks the handler. The CWD must complete the attack, bite and hold the decoy, and release on the command OUT. Only 1 verbal correction is authorized and the CWD must release the bite on the second command of OUT. The CWD must return to its handler when commanded to HEEL.

1.2.4. Standoff (critical). When commanded to STAY, the CWD must remain in the heel, down, or sit position, while off-leash. Only 1 command of GET HIM will be given. The correct response for this task is the dog will cease pursuit of a decoy on the command OUT, and then on command of HEEL, the dog will return to the heel position. For a standoff only 1 verbal correction is authorized and the CWD must stop pursuit on the second command of OUT. The CWD must respond to the command without biting the decoy. The dog is not allowed to nip and bite at the agitator after being commanded to out.

rated order contract carries a criminal penalty. *See id.* §§ 2071(a), 2073; *Martin*, 618 F.3d at 480. The statute provides, however, that "[n]o person shall be held liable for damages . . . for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act . . . ." *Id.* § 2157 (West, Westlaw through P.L. 114-49); *see Hercules Inc. v. United States*, 516 U.S. 417, 429 (1996) (noting that section 2157 "plainly provides immunity" and "expressly provid[es] a defense to liability . . .").

AMK9 has produced evidence indicating that its contract with the military was a "rated order" under this statute. However, Freeman disputes that AMK9 "compli[ed] with the . . . order" such that the section 2157 defense would apply. *See* 50 U.S.C.A. app. § 2157. In any event, AMK9's plea to the jurisdiction did not cite any authority, and we have found none, indicating that the section 2157 defense, even if established, deprives the trial court of subject matter jurisdiction.[7] We therefore conclude that the trial court erred if it granted AMK9's plea on this basis.

### 4. *Westfall* Immunity

Finally, AMK9 contends on appeal that it is entitled to absolute governmental immunity under *Westfall v. Erwin*, 484 U.S. 292 (1988).[8] In that case, the United States Supreme Court held that federal officials are entitled to absolute immunity from state tort

---

[7] The "immunity" referred to by the United States Supreme Court in *Hercules* is immunity from *liability*—which, unlike immunity from *suit*, does not implicate subject matter jurisdiction. *See Hercules Inc. v. United States*, 516 U.S. 417, 429 (1996); *see also Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015) ("Immunity from liability is an affirmative defense that bars enforcement of a judgment against a governmental entity, while immunity from suit bars suit against the entity altogether and may be raised in a plea to the jurisdiction.").

[8] Although AMK9 did not assert in its plea that it was entitled to *Westfall* immunity, we are required to consider "all of a defendant's immunity arguments, whether the governmental entity raised other jurisdictional arguments in the trial court or none at all." *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 136 (Tex. 2015); *Dallas Metrocare Servs. v. Juarez*, 420 S.W.3d 39, 41 (Tex. 2013).

liability for acts that are: (a) discretionary in nature and (b) fall within the scope of the officials' duties. *Id.* at 295–98. This test, as it applies to federal employees, was superseded by the passage of the Federal Employees Liability Reform and Tort Compensation Act. *Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169, 174 (2d Cir. 2006). But "the *Westfall* test remains the framework for determining when nongovernmental persons or entities are entitled to the same immunity." *Id.* (citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 72 (2d Cir. 1998)).

The *Westfall* Court noted that the purpose of official immunity "is not to protect an erring official, but to insulate the decisionmaking process from the harassment of prospective litigation." *Id.* at 583. But Freeman's suit does not seek to challenge the "decisionmaking process" of either the military or AMK9; instead, as we have explained above, it seeks to hold AMK9 liable for its failure to comply with decisions that were already made regarding training and supervision of the CWD. In other words, the acts which Freeman claims caused her to suffer injury did not "fall within the scope of [AMK9's] duties." *See Westfall*, 484 U.S. at 295–98. Accordingly, AMK9 is not entitled to immunity under *Westfall* and its progeny.

### 5. Summary

Because none of the theories raised by AMK9 operate to deprive the trial court of subject matter jurisdiction, the trial court erred in granting the plea to the jurisdiction. We sustain Freeman's first issue as it relates to her claims against AMK9.[9]

---

[9] In light of this conclusion, we need not address Freeman's second issue, by which she contends that the trial court erred in failing to give her an opportunity to replead. *See* TEX. R. APP. P. 47.1.

22

## C.  Jurisdiction Over Claims Against HCDC

We next address whether dismissal of the claims against HCDC was proper. Freeman contends that the trial court erred in dismissing those claims because HCDC did not file a plea to the jurisdiction. HCDC responds on appeal by arguing that the trial court properly found, *sua sponte*, that it lacked jurisdiction over Freeman's suit against it. In particular, HCDC appears to argue that the trial court lacked jurisdiction because (1) "[a]s a matter of law, liability related to domestic animals runs only to the owner or keeper of the animal at the time of the incident" and (2) Freeman judicially admitted that only AMK9 owned or kept the dog at issue at the time of the incident.

We find that the trial court's *sua sponte* dismissal of the claims against HCDC was erroneous. HCDC did not put forth any authority establishing that it was immune to Freeman's suit, either under any of the theories advanced by AMK9 or under any other theory. Further, even assuming that HCDC is correct that "liability related to domestic animals" may only be imposed on "the owner or keeper of the animal at the time of the incident" and not on a third party, HCDC has not directed us to any authority, and we find none, establishing that a trial court lacks subject matter jurisdiction over such claims against a third party.[10] We sustain Freeman's first issue as it relates to her claims against

---

[10] We note that HCDC had filed a motion to dismiss Freeman's claim against it pursuant to Texas Rule of Civil Procedure 91a. *See* TEX. R. CIV. P. 91a (allowing for expedited dismissal of "baseless" causes of action). However, Freeman and HCDC later entered into a Rule 11 agreement stating in part as follows:

> HCDC agrees to withdraw its New Rule 91a Motion to Dismiss that is set for October 30, 2013, and [Freeman and HCDC] agree to reset the motion and hearing to occur at a later date and time that is convenient to both parties. The agreement between the parties shall not prejudice or prohibit Defendant, HCDC from having its Rule 91a Motion to Dismiss heard and ruled upon by the court outside the statutory deadline.

The parties dispute whether HCDC "withdrew" the Rule 91a motion by this agreement or merely consented to have it heard at a later date. In any event, it is undisputed that the trial court never ruled upon any Rule 91a motion. Therefore, the issue of whether the claims against HCDC should have been dismissed under the rule as "baseless" is not before us on appeal.

HCDC.

### III. Motion to Designate Responsible Third Parties

Freeman contends by her third issue that the trial court erred in granting AMK9's motion for leave to designate the Army and/or DOD as responsible third parties.[11] A "responsible third party" is defined as

> any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these.

TEX. CIV. PRAC. & REM. CODE ANN. § 33.011(6) (West, Westlaw through 2015 R.S.). A defendant may move to designate a responsible third party, and the trial court must grant the motion unless another party files a timely objection and establishes:

(1) the defendant did not plead sufficient facts concerning the alleged responsibility of the person to satisfy the pleading requirement of the Texas Rules of Civil Procedure; and

(2) after having been granted leave to replead, the defendant failed to plead sufficient facts concerning the alleged responsibility of the person to satisfy the pleading requirements of the Texas Rules of Civil Procedure.

*Id.* § 33.004(a), (g) (West, Westlaw through 2015 R.S.). We review a trial court's ruling on such a motion for abuse of discretion. *MCI Sales & Serv. v. Hinton*, 272 S.W.3d 17, 36 (Tex. App.—Waco 2008), *aff'd*, 329 S.W.3d 475 (Tex. 2010); *see In re Arthur Andersen LLP,* 121 S.W.3d 471, 483 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding) (noting that "a trial court ordinarily has great discretion regarding joinder of third parties"); *see also Helm v. Kingston*, No. 13-10-00224-CV, 2011 WL 6746064, at *9 (Tex. App.—

---

[11] The order purportedly granting the motion states that "Defendants' Motion for Extension of Time to Designate Responsible Third-Parties is in all things GRANTED." The parties do not dispute that the trial court actually intended to grant AMK9's motion rather than merely to grant an extension of time.

24

Corpus Christi Dec. 21, 2011, pet. denied) (mem. op.). A trial court has no discretion in determining what the law is or in applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

Freeman filed an objection to AMK9's motion to designate responsible third parties in which she contended that AMK9 "did not plead sufficient facts about the alleged responsibility of [the Army or DOD] to satisfy the pleading requirements of the Texas Rules of Civil Procedure." *See id.* § 33.004(g)(1).

In its motion, AMK9 pleaded the following facts regarding the alleged liability of the Army and/or DOD:

> [T]his suit involves a claim for personal injuries arising out of an alleged "attack" by an AMK9 contract working dog (CWD) while the plaintiff was on Forward Operating Base (FOB) Mike Spann in Afghanistan working as a civilian contractor. Although the "attack" admittedly did not even break the skin, Plaintiff has alleged that Defendant AMK9 failed to properly control the CWD under Texas strict liability and negligence law. Even assuming Texas law should apply to torts which occurred, if at all, in a combat zone in Afghanistan on a U.S. military base, AMK9 asserts that at all relevant time periods: (1) the areas involved in the incident were under the control of the United States Army and/or the United States Department of Defense; (2) that those parties had a contractual duty to design, construct, and provide the kennels from which the CWD "escaped," and (3) that AMK9 was commanded by U.S. military authorities to use those kennels, which AMK9 had no part in designing, constructing, or providing, with designation of the contract kennels being the sole responsibility of the site Military Working Dog Program Manager (U.S. Army personnel). The kennels were designed and built by the U.S. Army in such a fashion that the CWD was able to escape from her kennel even though the door to her specific kennel enclosure was closed and locked by AMK9 personnel, due to the responsible third parties' decision not to construct the center divider to the ceiling of the kennels.

"The elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338 (Tex. 2015). AMK9 has pleaded facts alleging that the Army had a "duty to design, construct, and provide the kennels," but it has not

25

alleged, either implicitly or explicitly, that the Army *breached* this duty by designing and constructing the kennels such that, if the outer door to the kennel were open, a CWD would be able to escape. AMK9 has not pleaded any facts establishing that the Army or DOD committed any other "negligent act or omission" or engaged in any "other conduct or activity that violates an applicable legal standard." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.011(6). Accordingly, we agree with Freeman that AMK9 failed to plead sufficient facts concerning the alleged liability of the Army and/or DOD. We conclude that the trial court abused its discretion in granting AMK9's motion for leave to designate the Army and/or DOD as responsible third parties.[12] Freeman's third issue is sustained.

## IV. CONCLUSION

We reverse the trial court's judgments (1) dismissing Freeman's claims against both AMK9 and HCDC for lack of subject matter jurisdiction and (2) granting AMK9's motion to designate responsible third parties. The cause is remanded for further proceedings consistent with this opinion.

DORI CONTRERAS GARZA,
Justice

Delivered and filed the
29th day of October, 2015.

---

[12] On remand, the trial court is directed to afford AMK9 the opportunity to replead. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.004(g)(2) (West, Westlaw through 2015 R.S.).